63 A.3d 1

**Cherie ROSS**

v.

**HOUSING AUTHORITY OF BALTIMORE CITY.**

**No. 10, Sept. Term, 2012.**

Court of Appeals of Maryland.

March 22, 2013.

**650**

William Beveridge, Jr. and Scott E. Nevin, (Law Offices of Peter T. Nicholl, Baltimore, MD; John Amato, IV of Goodman, Meagher & Enoch, LLP, Baltimore, MD), on brief, for Petitioner.

Paul J. Weber, (Hyatt & Weber, P.A., Annapolis, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, McDONALD, JJ.

**McDONALD, J.**

Unlike the bullet or the misplaced banana peel, the effect of toxic substances on the body is often subtle and slow, leaving cause uncertain. This gap of understanding is often bridged through science, probability, and inference from provable facts. As a result, expert testimony has become central to toxic tort litigation.[1] But not every inference is provable in court by expert opinion testimony. Nor need it be.

This case arises out of an attempt to use expert opinion testimony of a pediatrician to establish the defendant's building as the source of the plaintiff's lead exposure and elevated blood lead levels. We hold that the Circuit Court did not abuse its discretion when it excluded the proposed expert testimony. However, the exclusion of that testimony was not necessarily a fatal blow to the plaintiff's case and we remand for reconsideration of the court's award of summary judgment in favor of the defendant.

## Procedural Background

### The Parties

The present dispute arises out of the alleged exposure of a woman to lead paint at the homes in which she spent her childhood. The Petitioner, Cherie Ross, was born on October 6, 1990. From that time until June 1992, Ms. Ross and her mother, Patricia A. Shandes, lived in Baltimore City at 934 N. Gilmor Street ("the Gilmor Street home"), then owned by Bernard Dackman. From June 1992 through at least 1996, they lived at 546 N. Payson Street ("the Payson Street home"), also in Baltimore City and owned by Respondent Housing Authority of Baltimore City ("HABC").

### The Complaint

On May 7, 2008, Ms. Ross, by her mother, sued Mr. Dackman and HABC in the Circuit Court for Baltimore City,

---

1. *See, e.g.,* Baumeister & Capone, *Expert Admissibility Symposium: Reliability Standards—Too High, Too Law, or Just Right?,* 33 Seton Hall L.Rev. 1025 (2003); Steinbock, Richman & Ray, *Expert Testimony on Proximate Cause,* 41 Vand. L.Rev. 261 (1988).

alleging that she had sustained permanent injuries from lead paint exposure at both properties. Specifically, Ms. Ross alleged that she had suffered permanent brain damage "resulting in developmental and behavioral injuries." The complaint included claims for negligence and unfair trade practices under the Consumer Protection Act as to each defendant. The claims against Mr. Dackman were settled shortly before the scheduled trial date in September 2010.[2]

*The Dispositive Motions*

Shortly before the scheduled trial date, the Circuit Court took up a number of motions in limine, including a defense motion to exclude expert testimony concerning the source of Ms. Ross' lead exposure and ingestion. After hearing testimony from the proposed expert, the Circuit Court rendered a bench opinion granting HABC's motion to exclude that portion of the expert's testimony. HABC's counsel then made an oral motion for summary judgment, arguing that the exclusion of the expert testimony doomed the plaintiff's case. After brief argument on the oral motion, the Circuit Court granted summary judgment in favor of HABC.

Ms. Ross appealed the exclusion of the expert testimony and the grant of summary judgment. In an unreported opinion, the Court of Special Appeals affirmed the ruling on expert testimony, but declined to consider further whether summary judgment was appropriate on the ground that Ms. Ross had not separately challenged that ruling. Ms. Ross petitioned for certiorari, which we granted as to both issues.

## The Plaintiff's Evidence

In the absence of a trial or formal written submissions by the parties concerning HABC's summary judgment motion, we must glean the relevant facts from the hearing testimony and the materials submitted in connection with the motion to

---

**2.** Earlier in 2010, Ms. Ross amended her complaint to add Mr. Dackman's estate and related entities. All of those claims were also resolved in the settlement.

exclude expert testimony—to which the grant of summary judgment was closely linked by both the judge and the parties.

The evidence relied upon by the plaintiff to support the expert opinion and avoid summary judgment falls into four major categories: (a) results of tests of Ms. Ross' childhood blood lead levels; (b) results of tests to detect lead paint and lead dust in the two homes in which Ms. Ross resided; (c) discovery materials describing Ms. Ross' childhood—excerpted from interrogatory answers and the deposition testimony of Ms. Ross' mother; and (d) testimony of the proffered expert, both in deposition and at the motions hearing.

### a.   Blood Lead Levels

Reports by the Maryland Department of Health and Mental Hygiene indicate that, while Ms. Ross lived at the Gilmor Street home, her blood lead levels tested as follows:

| Date Taken [3] | Blood Lead Level [4] |
|---|---|
| 10/10/91 | 10μg/dL |
| 1/9/92 | 8μg/dL |
| 4/28/92 | 10μg/dL |

Subsequent reports indicate that, while Ms. Ross lived at

---

**3.**  There is some discrepancy in the record below in references to the dates for these tests, as each test report includes at least two dates—the date the blood sample was taken and the date of the report of the results of the test.   In this opinion we use the date that the report indicates that the blood sample was obtained from Ms. Ross.

**4.**  Blood lead levels are given in micro-grams per deci-liter.   According to a 1991 publication of the federal Centers for Disease Control submitted by Ms. Ross at the motions hearing, readings equal to or greater than 15 μg/dL require follow-up action.   If the reading is in the range 15–19 μg/dL, there should be additional screenings every three to four months, the child's family be counseled, and a detailed environmental history should be taken to identify sources of lead exposure.   A child with a reading equal to or greater than 20 μg/dL should be referred for medical evaluation.   A child with a reading of 45 μg/dL should receive urgent medical and environmental attention, while a reading of 70 μg/dL or more is considered a medical emergency.   Another hearing exhibit—a 2005 publication of the American Academy of Pediatrics—contains similar guidelines and also recommends that children with blood lead levels above 10 μg/dL should be periodically re-checked.

the HABC Payson Street home, her blood lead levels tested as follows:

| Date Taken | Blood Lead Level |
|:---:|:---:|
| 11/30/92 | 10μg/dL |
| 4/6/93 | 11μg/dL |
| 8/31/93 | 14μg/dL |
| 11/9/93 | 10μg/dL |
| 12/16/94 | 9μg/dL |
| 12/20/95 | 7μg/dL |
| 3/25/96 | 7μg/dL |

### b. Lead Paint Tests

Ms. Ross relied on three reports from lead paint inspections performed in the HABC Payson Street home. Each indicated the presence of lead in certain parts of the house, although most of the test results were negative.

The first lead inspection report, dated February 20, 1992, was from an inspection by a company called Martel and is identified in the record as a "Post Abatement Lead Swipe Analysis Report." That report showed test results for numerous locations in the house. The only swipe taken that indicated "high value" for lead was from an exterior window well of the living room. That reading measured 1,500 μg/SqFt.[5]

The second lead inspection report, dated February 22, 1994, was from an inspection by a company called Mircon Inc. That report indicated that on the front exterior of the house the wooden window frame and outer window sills and concrete headers were in a "peeling and chipping condition." It further indicated that, in the first floor living room, kitchen, and den, there were sheetrock walls and ceilings and that the plaster walls behind the sheetrock were suspected to contain lead-based paint. While the report contains test results for numerous locations in the house, the only locations that tested positive for lead were the outer sill of the first floor window

---

**5.** These test results are given in micro-grams per square foot. The record does not provide much explanation on the relative significance of these measurements.

and the header to the cellar—both of which are exterior locations.

The third lead inspection report, from a 2009 environmental survey by a company called ARC, detected lead on a stair-riser on an interior staircase.

### c. Discovery Materials Concerning Ms. Ross' Childhood

At her deposition on October 15, 2009, Ms. Shandes testified to the following:

When Ms. Ross was born, Ms. Shandes resided at the Gilmor Street home. According to Ms. Shandes, her daughter did not visit any other properties or attend day care while they lived at the Gilmor Street address. Her daughter would crawl around and sit on the steps while living at the property. At the house, Ms. Shandes noticed flaking paint on the front porch and on the inside of the house around the windows and trim.

When Ms. Shandes moved with her daughter to the HABC Payson Street home, the property was in excellent condition except for the windows, which she described as "rotten" with "paint peeling." As at the Gilmor Street home, Ms. Shandes and her daughter sat outside on the steps of the Payson Street home. The outside steps were close to the flaking, peeling, and chipping paint around the windows.

As a child, Ms. Ross never visited a friend's house because "she had a problem. She didn't even start talking like a regular child would talk. She didn't start talking until she was almost four years old." After Ms. Ross began school, she spent time at her grandmother's house—also an HABC-owned property—three or four times a week. According to Ms. Shandes, her mother's property also had "stuff falling where it's painted at. Around the window frames falling and stuff."

Finally, the answers to interrogatories filed on behalf of Ms. Ross stated that, as a young baby, she would put non-food items in her mouth—a behavior sometimes referred to as "pica."

### d. Testimony of Proposed Expert

Counsel for Ms. Ross indicated that he intended to call several experts at trial.[6] The expert who was the subject of the dispositive motion in limine was Dr. Jacalyn Blackwell–White, a pediatrician with more than 20 years experience. Dr. Blackwell–White was retained by counsel for Ms. Ross to provide an opinion on whether Ms. Ross had been exposed to toxic lead levels and whether that exposure had caused brain impairment. Dr. Blackwell–White had not treated or met Ms. Ross; nor did she visit either of the residences at issue in the case. In 2009, she reviewed various records concerning Ms. Ross and her two residences. Based on that review, Dr. Blackwell–White furnished two reports that opined that Ms. Ross had been exposed to lead-based paint at both residences, that such exposure "resulted in sustained toxic blood levels" during her early developmental years, and that the end result would be life-long neuropsychological impairment.

Excerpts of Dr. Blackwell–White's deposition testimony were submitted to the court and she also testified in person at the hearing.

In her deposition testimony, Dr. Blackwell–White explained that, when presented with a child in her pediatric practice with an elevated blood lead level, she would question the child's parents about the age, location, and condition of their residence and other properties which the child visited. She indicated that chipping and peeling paint and lead dust in a child's residence were likely sources of lead exposure, although she conceded that there could be other sources, such as other houses in the neighborhood, toys, and environmental exposure such as automobile exhaust. In some instances she would contact the Baltimore City Health Department, which would then try to "more clearly identify" the source of the

---

**6.** The court denied motions in limine to exclude testimony by two experts who would testify as to limitations on Ms. Ross' future earnings ability.

child's condition and, if traced to lead paint in the house, order the owner to remedy the condition.[7]

At the motions hearing, Dr. Blackwell–White testified that she had an extensive practice identifying and treating children suffering from lead poisoning. She explained that, nonetheless, she was not capable of definitively determining the source of lead exposure. Rather, she was merely assessing risks. At the same time, she agreed that she was not a certified lead risk assessor.[8]

When questioned as to her methodology, Dr. Blackwell–White testified that she used a questionnaire with a patient to assess risk for lead exposure. The questionnaire was derived from recommendations by the federal Centers for Disease Control ("CDC") and the American Academy of Pediatrics.[9] She explained that she would typically work with parents to identify and eliminate sources of lead exposure in the home, as well as other potential exposure sources, such as lead from parents' workplaces, canned food, jewelry, and toys. She further explained that this form of questioning was the "best practice" for identifying lead risks and was generally accepted in the pediatric medical community.

She further testified that scientific literature she had consulted indicates that, when a child has an elevated lead level, the most likely source of that lead is the property where the child resides: "If there's peeling, flaking paint in an old house, that is the most likely source of exposure for a child with

---

**7.** Dr. Blackwell–White stated that if the child's blood lead level exceeded 10 μg/dL, she would be required to notify the Baltimore City Health Department.

**8.** Individuals who test dust for lead contamination or conduct inspections for lead paint in rental properties must be accredited by the Department of the Environment. *See* Maryland Code, Environment Article, § 6–818; *see also* COMAR 26.16.01.02B(14) (defining "lead paint risk assessor" as an individual who "conducts inspections, interprets information regarding the presence and condition of lead-containing substances, and prepares reports characterizing hazards associated with identified lead-containing substances").

**9.** See footnote 4 above.

elevated lead levels." She explained that this was because "they're crawling and walking all over that property, getting their fingertips full of lead. And even if you do [not] see them gnawing at the windowsill or with paint chips in their mouth, they're picking up lead dust on their little sticky fingers, and they're putting them in their mouths because that's what children do."

Dr. Blackwell–White stated that she relied on numerous academic and governmental sources for this presumption. In particular, she referenced an October 2009 letter from the Maryland Department of the Environment, which stated that residences built prior to 1950 are 90 percent likely to contain lead and that residences built between 1950 and 1970 are 60 to 80 percent likely to contain lead. She also referenced a Morbidity and Mortality Weekly Report of the CDC dated November 2, 2007, which estimated that 68 percent of American homes built before 1940 have lead hazards, as do 43 percent of those built during 1940 to 1959 and eight percent of those built between 1960 and 1977, and that the percentages tend to be higher in the Northeast United States.

When asked what factors she takes into account when rendering an opinion in litigation as to the source of lead exposure for a child, she explained that "it's a little different from my clinical practice" in that she relies largely on documents provided to her and does not speak to the child or parents. She stated:

So I am given lead levels, I'm given an address where those lead levels have been taken. So I'm looking at first the house where the child lived when those levels were drawn and then assessing risk for that house. And I use age, I use condition of the house, usually based on interrogatory or deposition testimony, or sometimes notes from the Health Department investigation. I use, when they're available to me, Maryland Department of the Environment testing information. . . . .

I also look for, while the house is kind of at the highest level of my differential of where the source may be, I look

for testimony regarding where else that child visited, where that child played, where that child went to daycare. Obviously, the age of the child when the lead level was drawn.

As to the significance of changes in a child's blood lead levels, Dr. Blackwell–White explained: "The higher the lead level the greater the exposure. If the lead levels fall it can either mean that the source of the lead has been removed or that the child has outgrown a lot of mouthing activity.... Sometimes the fall too can go towards season. Lead levels tend to be higher in the summer months, lower in the winter months."

When asked about the significance of outside exposure, she explained: "I consider outside exposure because children go outside, and if there's lead dust flaking from the outside of the residence it can be, number one, tracked in on shoes to the inside where children can get to it. And then again in the summer months windows go up and the dust blows in." She further emphasized that the child's ability to have access to the areas that might be deteriorated is a significant factor.

With respect to this case, Dr. Blackwell–White said that it was her opinion that the HABC Payson Street home was "the source" of the elevated blood lead levels of Ms. Ross during the period from March 1992 through 1994. Dr. Blackwell–White explained that her opinion was based on the following factors: (1) the increase in Ms. Ross' elevated blood lead levels when she moved from the previous address to the HABC Payson Street home; (2) the age and condition of the property as well as the lead inspection tests from the Payson Street home, which Dr. Blackwell–White described as indicating the presence of lead (although she conceded that some of the test levels on which she relied did not meet HUD thresholds for lead hazard); (3) the access Ms. Ross had, as a child, to the areas suspected to contain lead paint dust inside the house; (4) the possibility that lead dust would escape into the living area (a) from the exterior window frame through the open window and (b) from the plaster walls suspected to contain lead paint through cracks in the sheetrock; and (5) the lack of other likely sources of lead exposure during the time Ms. Ross was living at the Payson Street home.

On cross-examination, Dr. Blackwell–White was asked: "Is it your opinion that if there is intact lead-based paint inside the house it is automatically considered to be the contributing cause of elevated blood lead levels?" She replied: "If there is lead-based paint inside a house, I will consider it to be a contributing cause to elevated lead levels." She elaborated that she would assume the home to be the most probable source of elevated blood lead levels "until proven otherwise," particularly if the house was built before 1970.

### Circuit Court Oral Ruling

■ While Dr. Blackwell–White's testimony had covered a range of subjects related to lead poisoning in children, the key point was her opinion that the HABC Payson Street home was the source of Ms. Ross' exposure to lead and a resulting elevation in her blood lead level during the period from 1992 to 1994. In moving to exclude that opinion, HABC initially asserted that such opinion testimony was not admissible under the *Frye/Reed* standard [10] applied by Maryland courts for certain types of expert scientific testimony because she did not use a generally accepted methodology to gather facts or to formulate her opinion. While the motions hearing and some of counsel's argument concerned application of the *Frye/Reed* test, the Circuit Court ultimately decided that the issue before it actually concerned an application of the standards of Maryland Rule 5–702.[11] That rule provides:

---

**10.** Under the *Frye/Reed* standard, an expert opinion must be based on a scientific method or principle that has gained general acceptance in the relevant scientific community. *See Blackwell v. Wyeth, Inc.*, 408 Md. 575, 584–93, 971 A.2d 235 (2009). The label attached to the standard refers to the decision of this Court that adopted the standard and the Supreme Court decision from which it was derived. *See Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978).

**11.** On the first day of the motions hearing, before Dr. Blackwell–White had testified, the Circuit Court appeared to exclude her testimony based on the *Frye–Reed* standard, but later relented and agreed to hold an evidentiary hearing on the question.

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

The court concluded that the proffered expert testimony on causation failed to satisfy the first and third prongs of the rule. In particular, the Circuit Court concluded that Dr. Blackwell–White lacked the qualifications to give that opinion.[12] In addition, the Circuit Court found that Dr. Blackwell–White's proposed testimony that the Payson Street home was a substantial factor in causing the increased blood lead levels had an inadequate factual basis.[13] Finally, the Circuit Court questioned the helpfulness of that proposed testimony—*i.e.,* whether, in the words of the rule, it would "assist the trier of fact to understand the evidence or determine a fact"—the ultimate yardstick against which expert testimony is measured under Rule 5–702.[14]

---

12. The Circuit Court stated:

     The court also finds that the doctor is not qualified to interpret these expert [lead test] reports, does not have the qualifications to interpret these expert reports and to answer questions and render opinions about the meanings and significance of the findings in these expert reports that would cause her to conclude these reports show the child living in Payson Street was a substantial contributing factor to her lead exposure.

13. In the court's view, the "sole objective criteria" for the proffered opinion that the Payson Street home was the source of the elevated blood lead levels was a single positive test reading from a window sill in the Martel report.

14. In that regard, the Circuit Court stated:

     We have no further information about this report from the doctor that she's even able to interpret the report beyond that this is a high

In the course of its ruling, the court noted that Dr. Blackwell–White was qualified to testify as an expert in pediatrics and childhood lead-poisoning. This, however, the court found to be distinct from the question of whether Dr. Blackwell–White could offer an opinion as to the source of Ms. Ross' lead exposure and elevated blood levels, which the court referred to as an opinion on "substantial contributing factor" or "causation." Thus, as best we can determine from the record, the only portion of Dr. Blackwell–White's testimony that was excluded was her opinion that the Payson Street home was the source of Ms. Ross's lead exposure during the relevant time period that led to enhanced blood lead levels.

Following the grant of the motion to exclude Dr. Blackwell–White's opinion, counsel for HABC moved for summary judgment. The Circuit Court granted the motion, reasoning that, "there being an absence of testimony with respect to causation in this matter and no genuine dispute of material facts" relating to causation, the defendant was entitled to judgment as a matter of law.

## Discussion

*Whether Dr. Blackwell–White's Opinion Testimony Was Properly Excluded*

The first question before us is whether the Circuit Court acted within its discretion in excluding Dr. Blackwell–White's opinion as to the source of Ms. Ross' lead exposure. *See Rollins v. State,* 392 Md. 455, 500, 897 A.2d 821 (2006) (decision to admit or exclude expert opinion testimony under Maryland Rule 5–702 reviewed under abuse of discretion standard).

We agree with the Court of Special Appeals that the Circuit Court acted within its discretion when it determined that Dr. Blackwell–White lacked qualifications to provide an expert opinion as to "the source" of lead exposure that resulted in

value and the other values tell me or make me think that there was lead here.

Ms. Ross' elevated lead levels.[15]  Similarly, the Circuit Court was within its discretion in determining that Dr. Blackwell–White lacked an adequate factual basis to render an expert opinion identifying "the source" of Ms. Ross' lead exposure.

█   Most importantly, the premise for admission of an expert opinion under Rule 5–702 is a determination by the trial court that the opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue."  In order for an opinion to assist a trier of fact, the trier of fact must be able to evaluate the reasoning underlying that opinion.  *E.g., Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339–40 (7th Cir.1989).  Dr. Blackwell–White did not explain adequately how she reached the conclusion that the Payson Street home was "the source" of the lead exposure that resulted in Ms. Ross' elevated blood lead levels. Merely reciting certain information that she took into account and then stating the ultimate conclusion without explaining how and by what expert method that information was weighed did not provide a basis by which the trier of fact could evaluate that opinion.  Indeed, she testified that, in her own practice, she simply identified risks and relied upon the Health Department to find the actual source of a child's exposure.

---

**15.**  The intermediate appellate court aptly summarized the disconnect between Dr. Blackwell–White's qualifications and the opinion elicited from her:

Dr. Blackwell–White is not an epidemiologist and not a toxicologist.  As per her testimony, she has no technical knowledge regarding lead or lead testing.  Rather, Dr. Blackwell–White's training and experience is to determine blood lead level, to treat patients with elevated blood lead levels, and to counsel patients to avoid lead exposure.  She is not trained or experienced in quantifying lead exposure, identifying lead hazards, abating lead hazards, or in determining causality with respect to relative exposures, as distinguished from the general causality that lead exposure can cause an elevated blood lead level.  In effect, Dr. Blackwell–White implicitly opined that any exposure, no matter how slight, contributes to an elevated blood lead level.  That being the case, she had no basis on which to differentiate a specific exposure from other known exposures, environmental or otherwise.

Given the uncontroverted evidence that there were various other sources of lead exposure in Ms. Ross' environment, including her prior residence, and that she came to the Payson Street home with already elevated blood lead levels, there were likely multiple causes of her elevated blood lead levels. For example, Ms. Ross' mother testified that the house next door had considerable flaking exterior paint, some of which was visible on the ground around the Payson Street home. Each of those causes presumably contributed a certain amount of lead to Ms. Ross's blood. The real question for the fact-finder is *how much* exposure to lead at the Payson Street home contributed to Ms. Ross's blood lead levels over the pertinent time period—and ultimately to the developmental and behavioral injuries alleged in the complaint. Dr. Black-well–White testified at one point that she was merely identifying "potential risk" and could not make any statement as to causation with certainty. In that context, Dr. Blackwell–White's ultimate conclusion identifying the Payson Street home as "the source" was as likely to confuse as to assist a jury.

In those circumstances, the qualification of the witness as an expert would endow such an opinion—which otherwise appears difficult to distinguish from a lay opinion—with the imprimatur of court-endorsed expert status. It may be perfectly reasonable to conclude from the evidence that the Payson Street home was a source of lead exposure. But just because a conclusion is reasonable does not mean that a court must permit an expert to make it. "[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir.1986). Even where an expert may be better able to articulate an explanation that does not require expertise, the utility of the testimony may be outweighed by the risk that a jury would give the opinion undue weight because it was stated by a court-qualified expert. In such circumstances, a trial court is well within its

discretion in concluding that the testimony of the expert would not assist the trier of fact.[16]

*Whether Summary Judgment was Appropriate*

*Preservation of the Issue*

HABC argues that Ms. Ross agreed that she needed Dr. Blackwell–White's opinion testimony to survive summary judgment and thus waived appellate review of the court's ruling in light of the absence of that testimony. Although we agree that Ms. Ross could have better developed her alternative argument in the trial and intermediate appellate courts, she did not waive the issue.

Following the Circuit Court's ruling as to Dr. Blackwell–White's testimony, HABC orally moved for summary judgment. Counsel for Ms. Ross stated that, while he was under the impression that Maryland law required expert testimony as to causation in order to proceed to a jury in a case such as this one, he was not conceding that summary judgment was warranted. The Circuit Court then stated that, although there might well remain disputed issues of material fact in the case, the exclusion of Dr. Blackwell–White's opinion on the source of lead exposure dealt a fatal blow to the plaintiff's proof of causation. Accordingly, the court awarded summary judgment in favor of the defendant.

---

16. Ms. Ross asserts that we should defer to prior determinations of trial judges who may have admitted expert opinion testimony similar to that of Dr. Blackwell–White. There appears little merit in favor of an arbitrary consistency even if it were easy to compare the proffered expert testimony and other evidence in those cases with that in this case.

Moreover, whether a particular expert has been qualified as an expert previously is of limited value in determining whether that same expert should be qualified in a different case. *See, e.g., Elcock v. Kmart Corp.,* 233 F.3d 734, 744 n. 5 (3d Cir.2000) ("the mere fact that [an expert witness] was previously admitted as an expert witness qualified to give testimony . . . is irrelevant to the determination whether he is qualified to give such testimony in this case."); *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 800 (4th Cir.1989) ("it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying").

In her brief before the Court of Special Appeals, Ms. Ross listed the propriety of summary judgment as one of the "issues presented," but did not specifically brief the issue separately from the question of admissibility of the expert opinion. The Court of Special Appeals reasonably concluded that Ms. Ross was not challenging the grant of summary judgment apart from her argument to reverse the Circuit Court's ruling on the proffered expert opinion testimony. Accordingly, the intermediate appellate court accepted the implicit concession and did not separately analyze the grant of summary judgment. In her petition for certiorari, Ms. Ross, for the first time, explicitly argued that summary judgment was inappropriate even if the exclusion of Dr. Blackwell–White's testimony concerning causation is affirmed.

Maryland Rule 8–131 provides that appellate review is generally limited to those issues that were "raised in or decided by the trial court." While this rule generally precludes a party from asserting new grounds on appeal,[17] there is no waiver when a trial court decides a disputed issue and the losing party explicitly does not concede that issue. In this case, the Circuit Court clearly decided that Ms. Ross could not proceed without expert testimony identifying the HABC property as the source of her lead exposure during the relevant period. Although Ms. Ross' counsel may well have thought his case was doomed as a practical matter without the proffered expert testimony, he did not concede that summary judgment was appropriate. Thus, the merits of granting summary judgment in these circumstances was raised and decided in the Circuit Court and it is that judgment that Ms. Ross appealed. Despite the scant attention that the parties devoted to the issue in the intermediate appellate court, it has been preserved for our review.

*Standard of Review*

A trial court may grant summary judgment if there is no genuine dispute as to any material fact and the moving

---

17. *Eckhart v. Ayres,* 240 Md. 153, 213 A.2d 493 (1965).

party is entitled to judgment as a matter of law. Maryland Rule 2–501(f). The court is to consider the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Myers v. Kayhoe,* 391 Md. 188, 203, 892 A.2d 520 (2006). Accordingly, because the trial court's decision turns on a question of law, not a dispute of fact, an appellate court is to review whether the trial court was legally correct. *Piscatelli v. Smith,* 424 Md. 294, 305, 35 A.3d 1140 (2012).

In conducting this review, an appellate court is confined to the basis relied on by the trial court. *Sadler v. Dimensions Healthcare Corp.,* 378 Md. 509, 536, 836 A.2d 655 (2003). In this case, the basis of the Circuit Court's decision is clear. The Circuit Court determined that, "there being an absence of testimony with respect to causation" as a result of the exclusion of Dr. Blackwell–White's opinion on source, HABC was entitled to judgment as a matter of law.

### Causation in Lead Paint Cases

This Court has not previously undertaken an examination of causation in the context of a case involving injuries allegedly due to lead paint exposure. In *Bartholomee v. Casey,* 103 Md.App. 34, 56, 651 A.2d 908 (1994), the Court of Special Appeals stated that causation in lead paint cases may be proven by showing that the defendant's negligence was a "substantial factor" in causing the plaintiff's injury. That conclusion was derived from past decisions of this Court applying that standard in other contexts [18] and the Restate-

---

**18.** *Reed v. Campagnolo,* 332 Md. 226, 239–40, 630 A.2d 1145 (1993) (physician's negligence can be a substantial factor in "causing" a wrongful birth); *Owens–Illinois v. Armstrong,* 326 Md. 107, 119, 604 A.2d 47 (1992) (plaintiff must show that products supplied by the defendant were a substantial factor in causing asbestosis); *Dominion Constr. Inc. v. First Nat'l Bank of Md.,* 271 Md. 154, 163, 315 A.2d 69 (1974) (drawer's negligence was a substantial factor in "causing" the forgery).

ment 2d of Torts § 431.[19] This Court has previously suggested in dicta that it agrees with that analysis. *Pittman v. Atlantic Realty Co.*, 359 Md. 513, 521 n. 4, 754 A.2d 1030 (2000).

The theory of causation presented in this case [20] can be conceived of as a series of links: (1) the link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels, and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff. To be a substantial factor in causing Ms. Ross' alleged injuries, the Payson Street home must have been a source of Ms. Ross' exposure to lead, that exposure must have contributed to the elevated blood lead levels, and the associated increase in blood lead levels must have been substantial enough to contribute to her injuries.

Expert opinion testimony could be helpful in establishing any of the links and might sometimes be essential in proving the second and third links.[21] For purposes of this opinion, we focus on the first link. The identification of the Payson Street home as *a* source of Ms. Ross' lead exposure was an essential link in proving causation as to that property and defendant HABC. It is that link which, in the view of the Circuit Court,

---

**19.** That section reads:
  *What Constitutes Legal Cause*
  The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and
  (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.
  Restatement 2d of Torts § 431.

**20.** We do not mean to rule out the possibility of other ways that a plaintiff might demonstrate that lead exposure is a substantial factor in a resulting harm to an individual.

**21.** For example, in this case, the Circuit Court found that Dr. Blackwell–White was qualified as a pediatrician and expert in childhood lead poisoning and she might well have been qualified to provide expert opinion testimony on the latter two links.

could not be made by expert opinion testimony from Dr. Blackwell–White.

*Evidence That Can Prove Elements of Causation*

■ In our view, the link between a defendant's property and a plaintiff's childhood exposure to lead paint and dust may be established through circumstantial evidence, even if expert opinion testimony is not available. The Court of Special Appeals' decision in *Dow v. L & R Properties Inc.,* 144 Md.App. 67, 796 A.2d 139 (2002), is instructive. In that case, a child and her mother sued their landlord for injuries the child allegedly suffered as a result of ingesting lead paint in their home. The discovery materials and an affidavit of the mother indicated that the home had been built prior to 1950 and thus likely had lead paint, that there was chipping and peeling paint in areas where the child played and that the child placed paint chips in her mouth, that the child spent most of her time in the home while she lived there and did not have contact with other sources of lead during that period, and that the child developed lead poisoning.

The landlord in *Dow* moved for summary judgment, arguing that (1) the plaintiff had not identified an expert who would testify that there was lead paint on the premises and (2) there was no other direct evidence that the paint contained lead. As a result, the landlord argued, there was insufficient evidence to prove causation and the landlord was entitled to judgment as a matter of law. The Court of Special Appeals rejected that argument and concluded that the circumstantial evidence was sufficient to generate a genuine issue of material fact and thus defeat the landlord's motion for summary judgment. 144 Md.App. at 74–75, 796 A.2d 139. The court reasoned that it was not necessary for the plaintiff to prove causation by direct evidence; circumstantial evidence that "amounts to a reasonable likelihood or probability rather than a possibility" would suffice. *Id.* (quoting *Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851 (1970)). The court held that evidence offered by the plaintiff in opposition to the motion, if believed by the fact-finder, could support an inference that the property was the

only possible source of the child's lead poisoning.  *Id.* at 76, 796 A.2d 139.

In the present case, Ms. Ross argues that the test results and testimony adduced in her case would similarly permit a jury to infer that lead exposure at the Payson Street home was a substantial contributing factor to her blood lead levels and that therefore summary judgment is not appropriate.  At this stage of the case, all reasonable inferences must be taken in favor of Ms. Ross as the non-moving party.  On the record before us, it appears that such inferences would likely include: [22] that the lead investigation reports for the Payson Street home accurately identified lead on the property,[23] that Ms. Ross was exposed to paint dust and chips at that property as described by her mother, and that her blood lead levels rose during the first year they resided at that home.[24]  Because the Circuit Court's ruling with regard to Dr. Blackwell–White purported only to exclude her testimony as to the source of the lead exposure, the remainder of her testimony, including foundational and background information on lead poisoning, would also be considered in the light most favorable to Ms. Ross. As indicated above, the Circuit Court itself alluded to disputes of material fact unrelated to Dr. Black-

---

**22.** The significance of all of this evidence as well as the credibility of the plaintiff's mother would no doubt be subject to challenge by HABC at a trial.  On a motion for summary disposition by HABC, however, inferences are taken in favor of Ms. Ross.

**23.** The 1992 inspection returned positive results for exterior lead as well as "surface dust" on the interior.  The 1994 inspection again indicated the presence of lead on exterior walls.  The only direct evidence of an indoor source of lead was the 2009 ARC environmental survey that indicated the presence of lead on an interior stair riser, though it is not indicated in the record whether that location was tested earlier or whether it was in a deteriorating condition in the early 1990s.

**24.** While she still lived at the Gilmor Street home, Ms. Ross's blood lead levels measured 8 and then 10 μg/dL. After the move to the HABC Payson Street home, her blood lead level remained at 10 μg/dL in November 1992, within a year had risen to 11 μg/dL, and five months later rose to 14 μg/dL. Then, in little more than two months, her blood lead level fell to 10 μg/dL. A year later it was 9 μg/dL, and still another year later it was 7 μg/dL.

well–White, which presumably would foreclose a grant of summary judgment.

On the other hand, it may well be that, once the parties have marshaled the evidence without the expert opinion on source, it is clear which facts are disputed and which are not, and the limits of the inferences in plaintiff's favor are evident, summary judgment might still be warranted. For example, unlike *Dow,* there is evidence of other possible sources of lead exposure in this case. Moreover, because the parties and the Circuit Court were focused on whether Dr. Blackwell–White's expert opinion testimony established the Payson Street home as the source of lead exposure,[25] the record is unclear as to what evidence would have been offered to connect the exposure to Ms. Ross' elevated blood lead levels and the blood lead levels to the alleged injury.

In the end, we hesitate to attempt a thorough analysis of all of the evidence in this case. Neither the parties nor the judge in the Circuit Court did so, as all appeared to labor under the impression that Dr. Blackwell–White's opinion on source was the linchpin of plaintiff's proof of causation. On remand, the parties will have the opportunity to review the evidence and argue whether, taking the evidence and inferences in the light most favorable to Ms. Ross, there remains a fatal gap in her proof.

*Conclusion*

The exclusion of expert opinion testimony identifying HABC's Payson Street property as the source of Ms. Ross' lead exposure does not preclude Ms. Ross from establishing that link by circumstantial evidence. Accordingly, the case will be remanded to the Circuit Court for further consideration in light of this opinion.

---

**25.** HABC's oral motion for summary judgment was based on "the fact that there is no expert testimony that will indicate that [the Payson Street home] is a substantial contributing cause or the cause of ingestion of lead by [Ms. Ross]." The Circuit Court granted that motion "as a result of the Court's order ... not permitting the testimony of Dr. Blackwell–White on the source or contributing factor and the lack of factual basis for her testimony."

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN
PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT
WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR
BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH
THIS OPINION. COSTS TO BE SHARED EQUALLY BY THE PARTIES.