709 A.2d 162

N.B.S., INC.

v.

Rodney HARVEY, a Minor, etc. et al.

No. 1472, Sept. Term, 1997.

Court of Special Appeals of Maryland.

May 5, 1998.

Michael H. Burgoyne (Michelle L. Brown, on the brief), Towson, for appellant.

Scott E. Nevin (Saul E. Kerpelman, on the brief), Baltimore, for appellees.

Argued before WENNER and SONNER, JJ., and ROSALYN B. BELL, Judge (retired), Specially Assigned.

WENNER, Judge.

N.B.S., Inc. (N.B.S.), appeals from a judgment of the Circuit Court for Baltimore City entered in favor of appellees, Rodney Harvey and Shawntier White. On appeal, N.B.S. poses the following questions, which we have slightly condensed:

1. Did the trial court abuse its discretion in excluding the testimony of appellant's expert witness, Dr. Henrietta Sachs;

2. Did the trial court err in denying N.B.S.'s motion for judgment, at the close of both appellees' case and the entire case;

3. Did the trial court err in denying N.B.S.'s motions for judgment *not withstanding the verdict (JNOV)*, and new trial and/or remittitur;

4. Did the trial court err in denying N.B.S.'s motion *in limine* regarding a 1978 citation received for lead paint on the property in question; and

5. Did the trial court err in denying N.B.S.'s request to supplement its response to appellees' request for admission of fact number 9?

We shall respond in the negative, and affirm the judgment of circuit court.

## Facts

In October of 1980, Debbie Jones White (Ms. White) and her son, Rodney Harvey (Rodney), then three years old, rented and moved into 1040 N. Bentalou Street in Baltimore, owned and managed by N.B.S. At that time, Stanley Rochkind was the president of N.B.S. Ms. White was then pregnant with Shawntier White (Shawntier). On 21 September 1981, Rodney submitted to his first test to determine the level of lead in his blood. The test revealed a blood lead level of 54 micrograms per deciliter. Rodney's subsequent blood tests revealed lead levels in the area of 30 micrograms per deciliter. On that same day, Shawntier, then eight months old, also submitted to a blood test. Shawntier's test revealed a lead level of 20/21 micrograms per deciliter. Her subsequent blood tests revealed lead levels in the area of 20 micrograms per deciliter.

On 23 March 1995, appellees filed a twelve count complaint in the Circuit Court for Baltimore City, claiming damages from N.B.S. on a variety of theories, including negligence and violation of the Maryland Consumer Protection Act. Tests revealed that Rodney's full scale I.Q. was 78, with a purported loss of 10 IQ points because of lead poisoning. Such tests revealed that Shawntier's full scale IQ was 63, with a purported loss of 5 IQ points because of lead poisoning. At the time of trial, Rodney was 19, had left high school after the tenth grade, and had never received a diploma. Shawntier was 16

and in the ninth grade at the time of trial.[1] At the close of trial, the jury returned verdicts of \$325,000 for Rodney, and \$300,000 for Shawntier. This appeal followed.

## I.

N.B.S. first claims the trial court erred in excluding the testimony of its expert witness, Dr. Henrietta Sachs.[2] Dr. Sachs' testimony was excluded following extensive questioning as to her qualifications. According to N.B.S., the trial court improperly excluded Dr. Sachs's testimony on the basis of the *Frye/Reed* standard, that is, whether her opinion is "generally accepted" in the relevant scientific community. *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923); *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). In support of its position, N.B.S. relies on *Myers v. Celotex Corp.,* 88 Md.App. 442, 594 A.2d 1248 (1991), *cert. denied* 325 Md. 249, 600 A.2d 418 (1992). In *Myers,* we concluded that the trial court had improperly employed the *Frye/Reed* standard and abused its discretion in not permitting a medical doctor "to state his opinion as to how asbestos fibers cause cancer even though he could not state that the theory he espoused was generally accepted by the medical community." [3] *Id.* at 456, 594 A.2d 1248. N.B.S.'s reliance on *Myers* is misguided. After consid-

---

1. Both had, at various times, failed a grade. Rodney had failed both the second and ninth grades, and Shawntier had failed the fifth grade.

2. Dr. Sachs is a board certified pediatrician, licensed in 1948 to practice medicine in Illinois. From 1966 to 1972, she was actively involved in the operation of a clinic for the treatment of lead paint poisoning in the City of Chicago. Although she continued to consult at several such clinics, by 1977 she had stopped diagnosing and admitting lead paint patients into the hospital. Dr. Sachs retired in 1987, having spent the bulk of time between 1977 and 1987 consulting and conducting follow-up research to her work at the Chicago clinic. After 1987, her time was spent predominantly testifying as an expert witness, for both plaintiffs and defendants, in lead paint litigation.

3. The testimony sought to be introduced was the doctor's opinion as to how asbestos fibers cause cancer. "Such testimony was based upon [the doctor's] personal observations and professional experience, and thus required only a reasonable degree of medical probability." *Id.* at 458, 594 A.2d 1248.

ering Dr. Sachs's qualifications and deciding to exclude her testimony, Judge Rombro said, "I am not satisfied at all with the qualifications of Dr. Sachs. This is a person who has been retired ... for 10 years.... What concerns me here is she is—it's not just a question of disagreeing with somebody, that's what expert testimony is for.... There isn't another scientist, there isn't another physician out there who agrees with her underlying premises, and that is that you've got to be over 40 milligrams per deciliter ... before you're really dealing with illness." In other words, Judge Rombro concluded that Dr. Sachs was not qualified as an expert, given that there was no existing factual basis in support of her expert testimony. Rule 5–702(3). Thus, although appellees endeavored to exclude Dr. Sachs's testimony on the basis of the *Frye/Reed* standard, the trial court's exclusion of that testimony was based upon Maryland Rule 5–702.

"It is firmly established that the admissibility of expert testimony is within the trial court's discretion. The court's action in this area seldom provides a basis for reversal, although it may be reviewed on appeal and reversed for an abuse of discretion, error of law, or other serious mistake." *Potomac Electric v. Smith,* 79 Md.App. 591, 644–45, 558 A.2d 768 (1989), *See also,* Chief Judge Joseph F. Murphy, Jr.'s MARYLAND EVIDENCE HANDBOOK, 708 (2ND ed.1996). Maryland Rule 5–702 provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

A review of the record reveals that, in excluding Dr. Sachs's testimony, the trial court focused on the first and third prongs of Rule 5–702.[4] The trial court principally questioned

---

4. We note that the trial court only referred explicitly to Rule 5–702's first prong. It is clear, however, that Rule 5–702's third prong was also relied on.

the probative value of Dr. Sachs's testimony due to her long absence from the treatment of patients suffering from lead poisoning, and from active participation in research in that field. *See I.W. Berman Properties v. Porter Brothers, Inc.*, 276 Md. 1, 13, 344 A.2d 65 (1975). In *Berman*, the trial court refused "to allow [appellant's] architect . . . ," [ ] "to testify as an expert building contractor since he admitted that he had never been 'an individual builder,' [and] that the last time he had supervised construction of any type of building was for another contractor 30 years previously." [5] *Id.* at 12–13, 344 A.2d 65. As the trial court concluded, Dr. Sachs's absence from the practice of medicine was crucial because medical research in the field of lead poisoning had advanced substantially during those years. In fact, the first directive of the Center for Disease Control (CDC), concerning the effect of lead poisoning was not issued until 1975, three years after Dr. Sachs had ceased treating patients at her clinic. The CDC's most recent directive, issued in 1991, came four years after Dr. Sachs's retirement.[6] In addition, the trial court questioned the appropriateness of Dr. Sachs's testimony on the effect of lead poisoning, since she was unable to point to a single medical doctor currently practicing medicine or involved in such research who would agree with her view of the effects of lead poisoning. "An expert's judgment has no probative force unless there is a sufficient basis upon which to support his conclusions." *Worthington Constr. v. Moore*, 266 Md. 19, 29, 291 A.2d 466 (1972). In view of the extensive voir dire of

**5.** N.B.S. believes *Berman* is distinguishable because Dr. Sachs's absence from the practice of medicine was far less (approximately 20 years) than that of the architect in *Berman* (approximately 30 years), and the expert in *Berman* had never been involved in the type of project about which he was going to testify. While we acknowledge that *Berman* does not rest on all fours with the case at hand, the differences are not so great as to render it inapposite.

**6.** The CDC's 1991 directive sets the level of lead in the blood necessary for lead poisoning at 10 micrograms. Dr. Sachs, however, participated in the creation of a Surgeon General publication, which set the level necessary for lead poisoning at 80 micrograms. Needless to say, Dr. Sachs testified that she did not find the CDC's directive authoritative, it appears that she and the CDC view this area from separate generations.

Dr. Sachs as to her qualifications and her response to those questions, there was no abuse of discretion.

## II.

N.B.S. next claims the trial court erred in denying its motions for judgment at the close of the evidence presented by appellees, and at the close of the entire case. N.B.S. believes appellees failed to prove the existence of chipping and flaking of lead paint at 1040 N. Bentalou Street, or that they had had any notice of such a condition. Acknowledging that Ms. White, appellee's mother, testified to these conditions, N.B.S. maintains that because her testimony was inconsistent, vague, and contradictory it should have been entirely disregarded. In support of this argument, appellant cites to *Voss v. Mayor & City Council of Baltimore,* 246 Md. 345, 351, 228 A.2d 295 (1967)("[T]he testimony of the appellant is so inconsistent and contradictory as to make it doubtful whether it should be the basis of a legal conclusion."); *Ray v. Bassil,* 30 Md.App. 550, 352 A.2d 888 (1976)(Finding of negligence may not be sustained on evidence that is "too inconclusive, uncertain, vague, and contradictory")(*quoting Olney v. Carmichael,* 202 Md. 226, 231–32, 96 A.2d 37 (1953)); and *Tippett v. Quade,* 19 Md.App. 49, 56 309 A.2d 481 (1973)("If the direct evidence approaches the outer limits of credibility ... it would be insufficient.")(*quoting Short v. Wells,* 249 Md. 491, 240 A.2d 224 (1968)). We disagree that Ms. White's testimony approaches "the outer limits of credibility."

"In reviewing the trial court's decision ..., we 'shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.' Md.Rule 2–519(b) (1995) (citations omitted). Moreover, the court's determination should be upheld '[i]f there is any evidence, no matter how slight, legally sufficient to generate a jury question.'" *Washington Metro. Area Transit Auth. v. Reading,* 109 Md.App. 89, 99, 674 A.2d 44 (1996) (*quoting James v. General Motors Corp.,* 74 Md.App. 479, 484, 538 A.2d 782, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988)).

'Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury;' that the rule requires submission of the case to the jury if there be any evidence, however slight, legally sufficient as tending to prove negligence, the weight and value of such evidence being left to the jury; that to meet the test of legal sufficiency, the party having the burden of proving another party guilty of negligence cannot sustain this burden 'by offering a mere scintilla of evidence amounting to no more than a surmise, possibility, or conjecture that such other party has been guilty of negligence, but such evidence must be of legal probative force and evidential value.'

*Curley v. General Valet Service,* 270 Md. 248, 264, 311 A.2d 231 (1973) (*quoting Fowler v. Smith,* 240 Md. 240, 246–47, 213 A.2d 549 (1965)).

We are convinced by an examination of the record that appellees presented more than a "mere scintilla of evidence" of chipping and flaking lead paint in the premises. Ms. White testified that she had observed plaster falling from a crack in the ceiling while inspecting the premises, and notified N.B.S. of the problem. She also said she had obtained paint from N.B.S. because the premises needed painting. While painting, it was necessary for Ms. White to scrape peeling paint from and to repair holes in the walls. Ms. White was unaware of lead paint in the premises when she began renting it. Appellees presented sufficient evidence of lead paint, including the testimony of Stanley Rochkind and a 1978 notice of lead paint received from the City of Baltimore, for the trial court to deny N.B.S.'s motion for judgment. To be sure, cross-examination developed sufficient inconsistencies to raise questions about Ms. White's credibility, but that is its purpose.[7] Md. Rule 5–616. "If the testimony of one witness at

---

7. The record fails to reveal the dramatic inconsistencies claimed by N.B.S. While Ms. White's deposition answers were less complete than those given at trial, she explained on re-direct examination that her memory had been refreshed by the testimony of N.B.S. president,

the trial is legally sufficient, it matters not that this testimony may be contradicted by ten witnesses for defendant, or *even that it may be in conflict with statements before the trial, or testimony in a previous trial or other legal proceeding, of the same witness." Bond v. Forthuber,* 198 Md. 476, 483, 84 A.2d 886 (1951)(emphasis added). Generally, as was the case here, the question of a witness's credibility is left to the jury. *Beghtol v. Michael,* 80 Md.App. 387, 564 A.2d 82 (1989).

## III.

■ N.B.S. next claims the trial court abused is discretion in denying its motion for JNOV, new trial and/or remittitur because of the excessive and inappropriate verdicts returned by the jury. *Conklin v. Schillinger,* 255 Md. 50, 257 A.2d 187 (1969). The trial court said the jury verdicts were within the range of those generally returned in lead paint cases. Moreover, we do not agree with N.B.S. that they were either inappropriate or excessive. Both Rodney and Shawntier presented ample evidence of their exposure to lead paint as children, which resulted in brain damage.

## IV.

■ N.B.S. next claims the trial court erred in denying its motion *in limine.*[8] Unfortunately for N.B.S., this issue has not been preserved for our review. "Obviously, the trial judge may either grant or deny the motion [*in limine* ]. If the trial judge admits the questionable evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review." *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445 (1988).[9] As

---

Stanley Rochkind, and after reviewing numerous "work order" documents, generated by N.B.S. when the apartment was repaired.

**8.** Its purpose was to exclude evidence of a 1978 citation issued to N.B.S. by the City of Baltimore requiring that lead paint found at 1040 Bentalou Street be abated.

**9.** But for an exception to this rule *see Watson v. State,* 311 Md. 370, 372, fn. 1, 535 A.2d 455 (1988).

N.B.S. failed to object at the time the disputed evidence was actually offered, or when Mr. Rochkind was questioned about it, we decline to review the denial of the motion *in limine.* Md. Rule 8–131(a).

## V.

■ Finally, N.B.S. claims the trial court erred in denying its request to expand its answer to appellees' request for admission of facts number nine.[10]

> The court may permit withdrawal or amendment if the court finds that it would assist the presentation of the merits of the action and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

Md. Rule 2–424. Once again, our standard of review is whether the trial court abused its discretion, *Harvey v. Williams,* 79 Md.App. 566, 558 A.2d 756 (1989), and we conclude that it did not. As the trial court properly pointed out, N.B.S. would have ample opportunity at trial to explain its response to that request for admission of fact.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

**10.** Admission of facts number nine inquired whether N.B.S. "was aware, prior to the infant Plaintiff's occupancy of the premises of the presence of lead paint in the interior of the premises." N.B.S.'s response was "admitted," but it later sought to offer an explanation for that answer.