75 A.3d 327

**Raymond V. HAMILTON, Jr.**

v.

**Sandra B. DACKMAN, et al.**

**No. 2871, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 5, 2013.

590

Scott E. Nevin (George E. Swegman, David Owens, Law Offices of Peter T. Nicholl, John Amato, IV, Goodman, Meagher & Enoch, LLP, on the brief), Baltimore, MD, for Appellant.

Kevin A. Dowgiewicz (Thomas W. Hale, Leder Law Group, PC, on the brief), Baltimore, MD, for Appellee.

Panel: WRIGHT, KEHOE and NAZARIAN, JJ.

NAZARIAN, J.

The principle seems straightforward enough: a plaintiff who can make a *prima facie* case that a defendant's misconduct is probably a proximate cause of his injury should have his day in court. Applying this principle to the real-life facts of lead paint cases has often proven challenging, though, especially where the plaintiff lived or spent time in more than one dwelling of potential exposure. Raymond V. Hamilton, Jr. ("Raymond") appeals the summary judgment entered by the Circuit Court for Baltimore City, in favor of the appellees. The circuit court held that Raymond had not produced evidence sufficient to establish a *prima facie* case of lead expo-

sure at the one property at issue here, and the court declined to allow Raymond to use experts to fill the causal gaps. We affirm via a slightly different analytical path that, to be fair, has been refined in the meantime by the Court of Appeals in *Ross v. Housing Authority*, 430 Md. 648, 63 A.3d 1 (2013).

## I. BACKGROUND

Raymond was born on September 20, 1992. Throughout his childhood he lived in Baltimore City with his mother, Flora Vick ("Mother"). According to his answers to interrogatories, Raymond lived at the following houses: [1]

- From Raymond's birth until about February 1993, he lived at 636 North Gilmor Street (the "Gilmor Street property");
- from February 1993 to 1995, he lived at 1926 Harlem Avenue (the "Harlem Avenue property"); and
- from 1995 until 1999, he lived at 2102 Fulton Avenue (the "Fulton Avenue property").

The property at issue in this case is none of the above, but rather 701 Appleton Street (the "Appleton Street property"), the home of Raymond Hamilton, Sr. ("Father"), where Raymond often visited and sometimes stayed overnight.

At some point Raymond's blood-lead levels were tested, and from June 1993 to April 1997, sixteen reports issued by the Kennedy Krieger Institute ("KKI") indicated that Raymond had elevated blood-lead levels. Raymond filed suit on September 28, 2009, alleging that both the Appleton Street and Harlem Avenue properties contained lead-based paint that he ingested in the form of paint chips and dust, causing him to suffer lead poisoning and, ultimately, brain damage. His complaint included claims against numerous defendants (to whom we refer collectively as "Dackman" [2]) sounding in negli-

---

1. The record is not absolutely consistent on these dates, but we have assumed for purposes of our analysis that Raymond visited and/or stayed at 701 Appleton Street periodically from birth through 1995.

2. Over time, the defendants have included Jacob Dackman & Sons LLC, Jacob Dackman & Sons Partnership, Elliot Dackman (individually

gence and unfair trade practices. On July 1, 2010, Dackman answered the amended complaint and generally denied liability.[3]

As is frequently true in lead paint cases, discovery focused on whether Raymond's lead exposure could be connected to lead paint present in the properties at which he lived or that he visited. Discovery here revealed more than one alleged source of lead exposure. One was the Appleton Street property, which Raymond's answers to interrogatories described as having chipping, peeling and flaking paint in numerous places:

> Prior to [Raymond's] birth there was chipping, peeling and flaking ... paint in the front door frame, the interior door of the vestibule, floor in the living room, hallway leading from living room to the dining room, window in the dining room, windowsill and baseboards in the kitchen, banister and steps leading from main floor to second floor, windowsills, baseboards and doorframe in the front bedroom, baseboards and floor in the second floor hallway, and the windowsill and baseboards in the second floor bathroom. There was a hole in the wall in the living room that [Raymond] would try to play in/with. [Raymond] was caught with white dust on his hands after playing with the hole. The aforementioned areas of [chipping, peeling and flaking] paint remained throughout the period [Raymond] resided at the subject property. The subject property was never painted during the time [Raymond] resided there.

But although Mother testified that the properties where Raymond lived were in somewhat better condition, at least two also contained peeling paint, and one had lead-based paint both inside and outside:

---

and as general partner and trustee of Dackman Partnership), and the estate of Sandra B. Dackman—all of whom allegedly owned and operated the Appleton Street property and remain parties to this appeal.

3. James Clifton Whitaker, the sole defendant connected to the Harlem Avenue property, was dismissed on April 22, 2011 and is not a party to this appeal.

- The Gilmor Street property: Mother testified at her deposition that the residence was in good condition, and she could not recall any problems with respect to the condition of the paint at that property. She later admitted that she had informed personnel at KKI in June 1994, that the exterior had scaling paint on the exterior windows, doors, and in the front exterior of the house, and that the back porch of the apartment downstairs had chipping paint as well.

- The Harlem Avenue property: Mother testified that while she and Raymond lived there, the property contained chipping paint on the interior and exterior windowsills, doors frames, and exterior of the house. It was inspected for lead at some point and inspection revealed that the property contained "some traces of lead."

- The Fulton Avenue property: described by Mother as in "[p]retty good condition."

In an (undated) affidavit, Mother also sought to rule out other typical sources of lead exposure. Mother did not recall Raymond playing on painted playground equipment, but did recall that the front of the house at the Appleton Street property, where he did occasionally play, was cement. She recounted that he rarely played in the dirt or the back yard at the Appleton Street property, that the water in their homes did not have lead, and that he "did not come in contact with painted toys, lead figures, painted jewelry, old battery casings, glazed pottery from foreign countries, folk medicines, Venetian blinds with lead, fishing weights or gun powder." Mother also stated that Raymond "did not have any family members who worked in home demolition or with naval paint." On the other hand, she stated that at the time he was living at the Appleton Street property and visiting the Harlem Avenue property, Raymond "used to put objects, including paint chips, into his mouth."

Raymond also enlisted three experts to support his claims. *First,* Christopher J. White, a program manager at Arc Environmental, Inc., prepared a report entitled "Lead-based Paint

Survey Report (Exterior Only)," dated February 25, 2011 (the "Arc Report"), that contained the results of a technician's lead testing on eight *exterior* surfaces (no interior surfaces) of the Appleton Street property on February 18, 2011. The Arc Report described the property as a "vacant two story end of group brick row home," on which the technician tested "all accessible exterior components." The Arc Report concluded that one of the eight surfaces tested positive for the presence of lead—the rear exterior door transom, which had a reading of 2.6 mg/cm$^2$.[4] The Arc Report did not indicate whether the paint on the rear exterior door transom was intact or non-intact.[5]

Raymond's *second* expert, Robert K. Simon, Ph.D., a chemist, toxicologist and industrial hygienist, opined that the Appleton Street property was a source of Raymond's exposure to lead-based paint. He assumed from the age of the Appleton Street property that it contained lead-based paint (invoking Md.Code Regs. 26.16.01.03(A) (2013)).[6] In his deposition, Dr.

---

**4.** According to the Arc Report, a component is classified as testing positive for the presence of lead where the reading is greater than or equal to 0.8 mg/cm$^2$.

**5.** Raymond's counsel explained at the summary judgment hearing why there was no interior testing:

[Dackman] did not own the house at the time of this litigation. We did attempt to test the interior. Exhibit 5, we provided you a copy of the test by Clark Environmental. There is a note that the house was vacant and boarded at the time, so there was no way we could get [in] and by the time we got a hold of the actual owner, he had indicated to us that the place had been totally rehabilitated from the inside, so there's no reason to test it.

Although counsel referenced an "Exhibit 5" at the hearing before the circuit court, we do not see any such exhibit in the record and, as a practical matter, we have nothing before us to demonstrate either that testing was attempted or that the owner indicated that the property had been rehabilitated.

**6.** The regulation, contained in the Department of the Environment's provisions on lead abatement, states: "The presence of a lead-containing substance is presumed in any residential building constructed before 1950 unless a person determines that all painted surfaces are lead-free in accordance with § B of this regulation." Md.Code Regs.

Simon acknowledged that the Fulton Avenue property made "some possible contribution" toward Raymond's elevated blood-lead levels from 1995 onward, but testified that the Gilmor Street property was not a significant source of ingestion. He offered no opinion about whether Raymond was exposed to lead-based paint at the Harlem Avenue property because he was not "asked to determine whether that was a substantial contributing source," although he agreed that "it had some participation in the blood lead levels." When asked to describe the basis for his opinion that the Appleton Street property contained lead-based paint, Dr. Simon admitted that he assumed the presence of lead both there and at the Harlem Avenue property from the properties' age:

[COUNSEL]: . . . And in what way did [the Arc Report] contribute or support your findings?

[DR. SIMON]: None. I mean, the only testing they did was outside. They found one rear exterior door transom to have lead paint. It's 2011. It's way past the time when Raymond lived there. So, it really has no impact whatsoever.

[COUNSEL]: And that's because we don't know when that lead paint could have been applied; is that correct?

[DR. SIMON]: Well, it could be old paint. It wasn't applied theoretically after [19]78. So, apparently, that paint has been there, but it's only one outside sample of door transom. So, again, it's not really significant in terms of Raymond. Most of his time, he's going to be inside, not outside playing in a door transom.

[COUNSEL]: And you didn't see any testimony as to the condition of that door transom, the condition of the paint on the transom, did you?

[DR. SIMON]: No. . . .

\*　　\*　　\*

[COUNSEL]: So, could you tell me—do you have any evidence—if you're not relying on the Arc report, . . . what

---

26.16.01.03(A) (2013). Section B, in turn, defines the approved procedures for determining the lead content in paint.

evidence, if any, did you rely upon in concluding that [the Appleton Street property] contained lead-based paint?

[DR. SIMON]: Well, first of all, the house is built in 1920. It's a rental property. And as COMAR 2616 said if it's built before [19]50, Maryland presumes it's lead. . . .

\*    \*    \*

[COUNSEL]: So, in a nutshell, you're assuming that there was lead-based paint at [the Appleton Street property] during the time Raymond lived there; is that correct?

[DR. SIMON]: Correct.

[COUNSEL]: And are you also doing that for [the Harlem Avenue property]?

[DR. SIMON]: As far as I know. I mean, it's described as having—it's described as being in a better condition than [the Appleton Street property] but still having some chipped paint problems. That was described by the Baltimore City Health Department. That's what [Mother] said, and that's what's in the KKI documents.

So, there was, to some extent, deteriorated paint there.

He concluded, notwithstanding the deteriorated condition of the Harlem Avenue property, that the Appleton Street property was "the major source of the lead poisoning in this case."

Raymond's *third* expert, Dr. Jacalyn Blackwell–White, M.D., is a board-certified pediatrician who opined that the Appleton Street, Harlem Avenue, and Fulton Avenue properties all were sources of lead-based paint and that Raymond's injuries were caused by exposure at the sites:

It is my opinion that [Raymond] was exposed to lead based paint at [the Harlem Avenue property] and [the Appleton Street property]. Both properties were old and in the absence of physical lead assessment information, are presumed to have contained lead based paint. The properties were described as being in disrepair which would make such lead based paint available to an infant/child. [Raymond] was a crawling infant and toddler at both properties. He was observed to mouth fingers and toys and thereby could

have easily accessed and ingested peeling, flaking paint. *Without property lead assessment information, it is impossible to exclude [the Fulton Avenue property] as an additional lead source.* [Raymond] did continue to visit the [the Appleton Street] property after the family relocated to [the Fulton Avenue property]. His serum lead levels were lower after moving to [the Fulton Avenue property], but still in the teens (except for a bump to 29 in 1996) implying sustained exposure albeit at lower levels.

(Emphasis added.) At her deposition, Dr. Blackwell–White explained the basis for her assumption that the Appleton Street property contained lead-based paint:

[DR. BLACKWELL–WHITE]: [The Appleton Street property] is an older property. And depending on the literature you look at, 60 to 90 percent of buildings with residences built before 1950 that have not been gut rehabilitated, are presumed to contain significant amounts of lead.

[COUNSEL]: Is there any way, to a reasonable degree of probability in your field, that you can say that those locations that the mother has identified at [the Appleton Street property] as being in a defective condition, actually contained lead above 0.7 milligrams per centimeter square without having the XRF testing?

[DR. BLACKWELL–WHITE]: With 100 percent of certainty, no. With a high degree of probability, yes.

\* \* \*

[DR. BLACKWELL–WHITE]: ... I can only presume that in the 1990's, the presumption would be based on studies, information, journals, information I have historically that there would be lead paint in that exterior paint.

She applied these assumptions not only to the Appleton Street property, but also to the Harlem Avenue property:

[COUNSEL]: ... So, what you're telling me is that you presume that all components in a pre–1940 house, including the Appleton Street property, contain lead-based paint. Is that what you're telling me?

[DR. BLACKWELL–WHITE]: I come to these opinions based on the way I would approach it in some respect from my own clinical practice. I have a child with an elevated lead level. I have a child visiting or living in an older home with no information from, in this case, documents—in my office, it would be testimony from the parents or information from the parents—that that property has ever been totally renovated.

So, I essentially have a smoking gun. I have a house that's leaded. I have a child with lead. I have information that says to me the most likely source of lead exposure in leaded children is the home they either live in or visit frequently. Therefore, the most likely source for me is that house, that house of high visitation or that house of habitation until proven otherwise.... But [the Appleton Street property] is certainly one of the significant contributing factors to [Raymond's] lead burden.

[COUNSEL]: So, what do you mean by significantly contributing?

[DR. BLACKWELL–WHITE]: ... *I'd say that most likely, more likely than not, [Raymond's] source of lead-based paint or source of elevated blood lead level is [the Appleton Street property].*

[COUNSEL]: ... What does more likely than not mean to you?

[DR. BLACKWELL–WHITE]: High probability. Within a high degree of medical probability.... This would be much more than 50 percent.

[COUNSEL]: Now, you mentioned the term "smoking gun," and then you referred to [the Appleton Street property]. *But the reality of it is that we have several smoking guns in this case, do we not, Doctor?*

[DR. BLACKWELL–WHITE]: *I agree.*

[COUNSEL]: *And [the Harlem Avenue property] is one of those smoking guns; is that correct?*

[DR. BLACKWELL–WHITE]: *I agree.*

[COUNSEL]: And [the Harlem Avenue property] was actually where Raymond was living while he was visiting [the Appleton Street property]?

[DR. BLACKWELL–WHITE]: He was.

\*     \*     \*

[COUNSEL]: *So, what you're telling me is that [the Harlem Avenue property] is also, to a reasonable degree of probability, a potential source of Raymond's lead as well, right?*

[DR. BLACKWELL–WHITE]: *I agree, yes.*

[COUNSEL]: *So, you can't rule [the Harlem Avenue property] out?*

[DR. BLACKWELL–WHITE]: *I cannot.*

[COUNSEL]: *In fact, you're ruling it in?*

[DR. BLACKWELL–WHITE]: *I am.*

[COUNSEL]: So, what do you have on [the Harlem Avenue property] that leads you to that conclusion?

[DR. BLACKWELL–WHITE]: That [the Harlem Avenue property] too, was an older property in disrepair. And it was the property of residence when the elevated lead levels were found.

(Emphasis added.) Dr. Blackwell–White admitted that she reached these conclusions without having any test results from the Harlem Avenue property and with only the one positive exterior test result for the Appleton Street property.

After discovery concluded, Dackman moved for summary judgment on two grounds: (1) that Raymond had failed to provide either direct or circumstantial evidence demonstrating the presence of lead at the Appleton Street property during the relevant time period, and (2) that he could not rule out other properties as potential sources. The motion argued that Raymond never conducted a lead test on the interior of the property and that the presence of lead on only one of eight exterior surfaces was insufficient direct evidence of exposure to lead-based paint necessary to overcome a summary judgment motion. Dackman also claimed that because Raymond's

experts admitted they were unable to rule out other sources of lead exposure or other properties as containing lead, they lacked an adequate factual basis to conclude that the Appleton Street property was *the* source of his lead exposure.

Raymond opposed the Motion, claiming that there was "abundant evidence ... which would support a finding of negligence by a trier of fact." He argued that Mother's deposition testimony regarding chipping and peeling paint at the Appleton Street property demonstrated that Dackman violated the Baltimore City Housing Code which, in his view, automatically required the circuit court to submit the issue of negligence to a jury. He argued that the Arc Report's single positive test demonstrated he was exposed to lead at the Appleton Street property. And he claimed that this evidence coupled with the testimony of his experts established a *prima facie* case that the Appleton Street property was a "substantial contributing factor" to his injuries because he was required only to show that "he was, more likely than not, exposed to lead paint at a given subject property." He argued that he was not required to prove only a single source of lead exposure or a single cause of his injuries.

On January 27, 2012, after a hearing, the circuit court issued an Order granting summary judgment in favor of Dackman. The court's Memorandum Opinion explained that the sole positive test on the exterior of the Appleton Street property and the fact that Raymond admittedly split his time between two properties left insufficient evidence for a fact-finder to conclude that his elevated blood-lead levels resulted from exposure at the Appleton Street property. The court also held that the expert testimony of Drs. White and Simon failed to prove causation and that the COMAR regulation did not create a presumption of liability. The circuit court's thoughtful analysis is worth reproducing at some length:

> To establish the required causal connection between the flaking, loose, or peeling paint that amounts to the Code violation and the alleged injury of lead poisoning, a plaintiff must prove that the deteriorated paint was in fact the source of the lead affecting the plaintiff. The plaintiff may

do this by direct evidence that the paint was flaking, loose, or peeling; that it was lead paint; that it was ingested by the plaintiff; and that the lead caused injury. But the plaintiff may also satisfy this required causal connection by circumstantial evidence or by some combination of direct and circumstantial evidence. *Dow v. L & R Properties, Inc.*, 144 Md.App. 67 [796 A.2d 139] (2002). *Dow* illustrates one way in which this combination of direct and circumstantial evidence might add up to a *prima facie* case. Dow provided evidence that she lived in the property at issue, that the dwelling was built before 1950, that it contained chipping and peeling paint while she lived there, that she ate paint chips in the dwelling, and that she suffered from lead poisoning. *Id.* at 75–76 [796 A.2d 139]. Because Dow also presented evidence that she had lived only in that property from age two months until she was diagnosed with lead poisoning and that she "did not spend time anywhere else and was never exposed to any other sources of lead," the court concluded that the circumstantial evidence, if believed, "could establish that the chipping and peeling paint inside [the property at issue in *Dow* ] was the only possible source of Dow's lead poisoning." *Id.* This is not the only formula for circumstantial evidence that might meet a plaintiff's *prima facie* obligation, but it is one way to satisfy the test.

In this case, [Raymond] has presented evidence that he spent substantial time in [the Appleton Street property] and that chipping or peeling paint was present at that address while he lived or spent time there. He also has presented evidence that he experienced elevated blood lead levels during the time he lived or stayed at [the Appleton Street property]. The critical question is whether [he] can prove circumstantially or inferentially that that chipping or peeling paint contained lead and was the source of any lead ingested by him.

[Raymond's] only direct evidence of the presence of lead at [the Appleton Street property] is the 2011 exterior testing. That single positive test is insufficient as a matter of

law to support an inference that lead was present in the paint of any surface. First, it was a test of exterior surfaces only. There is no basis for the logical inference that lead in the exterior paint of the house necessarily means it was present in the interior of the house. Second, the fact that lead was found at only one of eight tested locations on the exterior of the house only reinforces the risks of inferring the presence at one location from the presence of lead at a different location. The Court does not understand [Raymond] to be arguing that the lead paint on the exterior transom itself was the source of his lead poisoning. That specific claim, if made, would be undercut by his mother's affidavit that [Raymond], while at [the Appleton Street property], "occasionally played in front of the house" and "rarely played in the back yard." In addition, the transom is above the rear door, at least six feet above ground level.

Unlike in *Dow,* [Raymond] here cannot rely on an inference that any lead that was in his blood necessarily came from a particular property. Here, [Raymond's] own evidence is that he was splitting his time between two homes during the period he experienced elevated blood lead levels. Even if the affidavit of his mother is taken as excluding all possible sources of lead other than the paint in the houses where he lived, [Raymond] himself alleges that he was exposed to lead from two different residences during the same time period. As a matter of law, no finder of fact could validly infer on this evidence alone that the lead in [Raymond's] blood came entirely from [the Appleton Street property], entirely from [the Harlem Avenue property], or partially from each address.

The Court rejects the proffered expert testimony of both [Drs. Blackwell–White and Simon]. [Dr. Blackwell–White] opines that [the Appleton Street property] and [the Harlem Avenue property] can be included as sources of [Raymond's] lead because "[b]oth properties are old and in the absence of physical lead assessment information, are presumed to have contained lead based paint." In his "Assessment of *Likely* Exposure Locations," [Dr.] Simon similarly comments that the house at [the Appleton Street property] was built in

1920 and that "[a] house of this age would be assumed to have had lead-based paint (LBP) as discussed in Maryland Department of Environment information and [COMAR] 26.16.01.03." No such evidentiary presumption or assumption exists in Maryland law, even if the issue were only the *likely* source of exposure. *See Dow*, 144 Md.App. at 74 [796 A.2d 139] (declining to decide the issue definitively, but observing that "no statutory provision expressly creates an evidentiary presumption" that a pre–1950 residential property in Maryland necessarily contains lead paint). "Obviously, the mere fact that most old houses in Baltimore have lead-based paint does not mean that a particular old Baltimore house has a similar deficiency."

For the same reason, this Court rejects [Raymond's] reliance on the regulation cited by [Dr.] Simon. The regulation provides: "The presence of a lead-containing substance is presumed in any residential building constructed before 1950 unless a person determines that all painted surfaces are lead-free in accordance with § B of this regulation." COMAR 26.16.01.03(A). This regulation is part of the Maryland Department of the Environment's rules applicable to lead abatement practices and provides, among other things, that precautions must be taken in doing abatement work based on this presumption unless it is established affirmatively that no lead is present. This regulatory premise for conducting safe abatement work is far different from an evidentiary presumption applicable in determining potential civil liability for personal injuries. The regulation does not create an evidentiary presumption.

\* \* \*

Because [Raymond] cannot prove that [the Appleton Street property] was a source of lead causing injury to him for purposes of his negligence claim, he also could not prove the essential element of causation for a claimed violation of the Maryland Consumer Protection Act based on the same property.

(Emphasis in original; omitting citations to record exhibits.) Raymond noted a timely appeal.

## II. DISCUSSION

This case is all about causation, and specifically whether Raymond offered legally sufficient evidence of causation to connect his injuries to the Appleton Street property. The circuit court found that he had not, and we agree. Although we phrase the issue slightly differently,[7] we hold that the evidence proffered here would have allowed a jury at most to find a *possibility* that the circumstantially-established lead exposure at the Appleton Street property was a source of Raymond's alleged injuries. That is not enough: a plaintiff must establish, consistent with the standards recently clarified by the Court of Appeals in *Ross,* 430 Md. 648, 63 A.3d 1, a *probability* that a property exposed him or her to injury-causing lead paint. As we explain below, we disagree that a plaintiff *necessarily* must eliminate *all* other possible sources of lead to proceed—a plaintiff could, if the facts allowed, establish a probability that more than one property is a source of injury. But by the time this case reached summary judgment, Raymond's case was down to one property, and his evidence as to that property fell short, both in terms of the tangible and circumstantial evidence and because his proffered expert testimony was grounded almost entirely on assumptions.

### A. Standard of Review

We review *de novo* the circuit court's decision to grant Dackman's motion for summary judgment. *Town of Oxford v.*

---

7. Raymond phrased the issues this way:
   I. Did the circuit court err when it granted [Dackman's] motion for summary judgment and refused to allow Dr. Blackwell–White and Dr. Simon to testify that [the Appleton Street property] was a substantial contributing cause of [Raymond's] injurious lead exposure?
   II. Did the circuit court err when it granted summary judgment to [Dackman] solely on the basis of the excluded opinions of Drs. Blackwell–White and Simon as to causation, based on the court's assessment that those experts did not sufficiently rule out other potential sources of lead exposure?

*Koste,* 204 Md.App. 578, 585, 42 A.3d 637 (2012), *aff'd,* 431 Md. 14, 63 A.3d 582 (2013). Maryland Rule 2–501 permits the trial court to grant summary judgment where "there is no genuine dispute as to any material fact" and "the party is entitled to judgment as a matter of law." In reviewing a grant of summary judgment, we "independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Reiter v. Pneumo Abex, LLC,* 417 Md. 57, 67, 8 A.3d 725 (2010) (citation omitted). "In order for there to be disputed facts sufficient for us to hold that granting summary judgment ... was error, there must be evidence on which the jury could reasonably find for appellant." *Benway v. Md. Port Admin.,* 191 Md.App. 22, 46, 989 A.2d 1239 (2010) (citation omitted). In reviewing the facts, "we construe the facts properly before the court and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party[.]" *Id.* (citation omitted).

"A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985) (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502 (1974)). Disputes over "non-material" facts do not preclude summary judgment. *Id.; Stewart Title Guar. Co. v. West,* 110 Md.App. 114, 133, 676 A.2d 953 (1996). Indeed, "[f]actual disputes that are irrelevant or unnecessary will not be counted, and when a movant has carried its burden, the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts." *Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 244, 603 A.2d 1357 (1992) (citations and internal quotation marks omitted).

We review a trial court's decision to admit expert testimony for an abuse of discretion. *Ross,* 430 Md. at 662, 63 A.3d 1. As we explained in *Taylor v. Fishkind,* 207 Md.App. 121, 51 A.3d 743 (2012):

> [T]he admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in

admitting or excluding such testimony will seldom constitute a ground for reversal. Therefore, [w]e review these types of evidentiary rulings pursuant to the abuse of discretion standard, reversing only when the court exercise[d] discretion in an arbitrary or capricious manner or ... act[ed] beyond the letter or reason of the law.

*Id.* at 137, 51 A.3d 743 (first alteration added) (omission in original) (citations and internal quotation marks omitted).

## B. Contentions

Raymond contends that with or without expert testimony, he produced sufficient circumstantial evidence of causation to defeat Dackman's summary judgment motion under *Dow*, 144 Md.App. 67, 796 A.2d 139, where the plaintiff was permitted to proceed without any assessment reports or demonstrable blood-lead level increases while living at the property at issue, and without any expert pediatrician specializing in child lead poisoning or a certified lead assessor. *Id.* at 75–76, 796 A.2d 139. He also asserts that his experts should have been permitted to offer their opinions that the Appleton Street property contained lead-based paint that caused his injuries, and that the trial court here improperly decided "issues of credibility" while taking "judicial notice of answers to the complicated medical issues of lead paint causation," citing *Davis v. Goodman*, 117 Md.App. 378, 700 A.2d 798 (1997) (which reversed summary judgment for the landlord because the trial court improperly made a credibility determination regarding plaintiff's expert). He invokes *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 835 A.2d 616 (2003), to argue that once he demonstrated a violation of the pertinent Baltimore City Code provision and the presence of chipping, flaking paint at the Appleton Street property, he established negligence and was legally entitled to proceed to trial. He urges us to apply the logic of *Ford v. Philadelphia Housing Authority*, 848 A.2d 1038 (Pa.Cmwlth.Ct.2004), where a Pennsylvania court affirmed a verdict in favor of a plaintiff based on what Raymond claims are similar factual circumstances.

Dackman responds that the circuit court properly granted summary judgment because Raymond did not present any direct or circumstantial evidence of lead-based paint in the interior of the Appleton Street property. Dackman also contends that the required circumstantial evidence may not be extrapolated from the causation opinions offered by Drs. Blackwell–White and Simon, which Dackman claims are "based on pure speculation[.]" Relying on *Taylor,* 207 Md. App. 121, 51 A.3d 743, Dackman maintains that this Court has already dismissed similar evidence (concerning the assumption of the presence of lead-based paint based on the age of the property, defective paint, elevated blood-lead levels, and an exterior lead test), as insufficient to prove that the "interior components of a property contained lead-based paint[.]" And Dackman points to the experts' inability to rule out the Harlem Avenue property as the source of Raymond's lead exposure, arguing that their failure to do so leaves them with no factual basis to opine that the Appleton Street property was a substantial factor in causing his injuries.

## C.  Analysis

We begin with the recent opinion of the Court of Appeals in *Ross,* 430 Md. 648, 63 A.3d 1, which was issued after oral argument in this case. *Ross* clarified the analytical landscape in lead paint cases by disengaging the inevitable battles over the qualifications of proffered experts from the core causation question at the heart of the summary judgment decision in that case (and now this one). To the extent there had been a belief that expert testimony on causation was a prerequisite to surviving summary judgment, *Ross* eliminated it. *Ross* held that although an expert *can* helpfully connect the causal dots between lead in a building and a plaintiff's injuries, the dots can be connected without any expert as well. *Id.* At the same time, an expert cannot transform thin evidence or assumptions into viable causal connections simply by labeling them an expert opinion. As such, *Ross* recalibrated the causation analysis to (re-)focus it on the quality of the evidence the

parties marshal rather than the existence *vel non* or qualifications of experts.

The Court of Appeals began its analysis in *Ross* by examining the circuit court's decision to exclude the plaintiff's proposed expert testimony and affirming. The expert there (also one of the proffered experts here, Dr. Blackwell–White) had opined that the property at issue was "the source" of the plaintiff's elevated blood-lead levels based on assumptions she drew from the plaintiff's increase in blood-lead levels when she moved to the home; the age and condition of the property and lead inspection tests indicating the presence of lead in the interior and exterior of the house;[8] the plaintiff's access to areas suspected to contain lead paint dust; the possibility that lead dust had escaped into the living area from exterior areas that tested positive; and—at least as Dr. Blackwell–White saw it—"the lack of other likely sources of lead exposure" during the time that the plaintiff lived at the subject property. *Id.* at 659, 63 A.3d 1. The Court agreed that Dr. Blackwell–White was not qualified and lacked an adequate factual basis to provide an expert opinion regarding the source of lead exposure. Her testimony, "without explaining how and by what expert method that information was weighed[,] did not provide a basis by which the trier of fact could evaluate that opinion." *Id.* at 663, 63 A.3d 1. Because there actually *were* other potential sources of exposure, the jury would have to determine how much exposure at the subject property contributed to the plaintiff's blood-lead levels. In that regard, Dr. Blackwell–White's unsupported conclusion that the subject property was the source "was as likely to confuse as to assist a jury," and qualifying her as an expert would improperly endow her opinion (which otherwise appeared difficult to distinguish from a lay opinion) with the "imprimatur of court-endorsed expert status." *Id.* at 664, 63 A.3d 1.

---

**8.** Testing showed positive results for an exterior window well of the living room, and indicated that numerous plaster walls behind sheetrock within the house were "suspected to contain lead-based paint." *Ross*, 430 Md. at 654, 63 A.3d 1. A third report detected lead on a stair riser on an interior staircase. *Id.* at 655, 63 A.3d 1.

But excluding the plaintiff's expert did not necessarily end the plaintiff's case: the Court held that "the link between a defendant's property and a plaintiff's childhood exposure to lead paint and dust may be established through circumstantial evidence, *even if expert opinion testimony is not available.*" *Id.* at 669, 63 A.3d 1 (emphasis added). The discussion that followed reviewed the evolution of lead paint cases examining the question of causation, starting with *Bartholomee v. Casey,* 103 Md.App. 34, 651 A.2d 908 (1994), *see Ross,* 430 Md. at 667–68, 63 A.3d 1, and likening the causation analysis to links in a chain:

> The theory of causation presented in this case can be conceived of as a series of links: (1) the link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels, and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff. To be a substantial factor in causing Ms. Ross' alleged injuries, the [subject property] must have been a source of Ms. Ross' exposure to lead, that exposure must have contributed to the elevated blood lead levels, and the associated increase in blood lead levels must have been substantial enough to contribute to her injuries.

*Id.* at 668, 63 A.3d 1 (footnote omitted).

The Court zeroed in on the first link, the one the circuit court found lacking once Dr. Blackwell–White's testimony was excluded, and reestablished that that link could be proven by circumstantial evidence. The Court discussed our opinion in *Dow,* 144 Md.App. 67, 796 A.2d 139, in which we held that circumstantial evidence that "[a]mounts to a reasonable likelihood or *probability* rather than a possibility" would suffice. *Id.* at 75, 796 A.2d 139 (quoting *Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851 (1970) (emphasis added)). Because the plaintiff's evidence in *Dow* could have, if believed, established that "chipping and peeling paint inside the [subject property] was the only possible source of Dow's lead poisoning," *id.* at 76, 796 A.2d 139, we had held in that case that

summary judgment was improper.[9]  Against that backdrop, the *Ross* opinion then explained how its holding drove the causation analysis on remand:

> [I]t may well be that, once the parties have marshaled the evidence without the expert opinion on source, it is clear which facts are disputed and which are not, and the limits of the inferences in plaintiff's favor are evident, summary judgment might still be warranted.  For example, unlike *Dow,* there is evidence of other possible sources of lead exposure in this case.  Moreover, because the parties and the Circuit Court were focused on whether Dr. Blackwell–White's expert opinion testimony established the Payson street home as the source of lead exposure, the record is unclear as to what evidence would have been offered to connect the exposure to Ms. Ross' elevated blood lead levels and the blood lead levels to the alleged injury.

*Ross,* 430 Md. at 671, 63 A.3d 1 (footnote omitted).

Now that *Ross* has resolved an important question about *how* a plaintiff can prove causation, we turn to the causation standard itself.  Shortly before *Ross,* we had reconsidered the "probability" test in *Taylor,* which affirmed summary judgment based on the defendants' motion to exclude expert

---

**9.**  The plaintiff in *Dow,* 144 Md.App. 67, 796 A.2d 139, had submitted evidence demonstrating not just that the dwelling was built before 1935, but also that she had not lived *anywhere else* from the time she was two months old until the time she was diagnosed and that there were no other possible sources of lead than her home.  *Id.* at 70–71, 796 A.2d 139.  The *Dow* Court in turn looked at the facts in *Davis,* 117 Md.App. 378, 700 A.2d 798, where we reversed summary judgment for the landlord because the plaintiff produced specific evidence of causation through an affidavit from a lead paint inspector, who concluded that there was lead-based paint on the front exterior of the house, and from the plaintiff's mother, who testified that she and the plaintiff would "sit out on the front step everyday" next to chipping paint in the area that ultimately tested positive.  *Id.* at 389, 700 A.2d 798.  Although we pointed out in *Dow* that "Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury," *Dow,* 144 Md.App. at 75, 796 A.2d 139 (quoting *N.B.S. Inc. v. Harvey,* 121 Md.App. 334, 342, 709 A.2d 162 (1998) (citations omitted)), we stressed that "[o]f course, 'causation evidence that is wholly speculative is not sufficient.' " *Id.* (quoting *Lyon v. Campbell,* 120 Md.App. 412, 437, 707 A.2d 850 (1998)).

testimony and the trial court's subsequent conclusion that there was "no factual basis" for the opinion of the expert (again a pediatrician opining that lead-based paint at the subject property caused plaintiff's injury).[10] 207 Md.App. at 147, 51 A.3d 743. We held in *Taylor* that the expert's opinion "amounted to no more than a possibility that [the plaintiff] was exposed to lead-based paint at" the subject property. *Id.* Once that testimony fell away, the plaintiff had no evidence to support the probability that she was exposed to lead-based paint in the property at issue: as Raymond does here, she had alleged that she was exposed to lead-based paint at two properties, so there was insufficient evidence to prove that the property at issue in the case was the only potential source that might permit the process-of-elimination analysis of *Dow.*[11]

The "probability" test has been around since well before *Ross* and *Taylor,* and we have for some time required more of a plaintiff than simply a showing that he lived in an old house in an area where lead-based paint historically was present. *Davis,* 117 Md.App. 378, 700 A.2d 798, is cited often for the common-sense proposition that "the mere fact that most old houses in Baltimore have lead-based paint does not mean that a particular old Baltimore house has a similar deficiency." *Id.* at 393, 700 A.2d 798. The principle there, and one we have endorsed and followed elsewhere, is that a plaintiff bears the burden to establish the presence of lead in the child's environment, and cannot just assume it merely from the age or location of the house. *Id.; Taylor,* 207 Md.App. at 143, 51 A.3d 743. We also recognize the real-life evidentiary chal-

---

**10.** We also seemed to see *Ross* coming: we noted that the expert's opinion was "only supported by the age of the house and the presence of lead on one component of the exterior of the house," *id.* at 142, 796 A.2d 139; that there was no way to rule out prior or other sources of exposure; and that the only evidence of the plaintiff's exposure was an elevated blood-lead level while living there. *Id.*

**11.** This was true especially in light of the medical expert's deposition testimony that the plaintiff's elevated blood lead level at the property "could have been the result of lead that was already in her body from a source prior to when she moved to" the property. *Taylor,* 207 Md.App. at 146, 51 A.3d 743.

lenges that proving lead paint injuries poses (based on practical realities like the relocation of residents and subsequent gut-rehabilitation or remediation of properties that improves present living conditions but spoils potential evidence pertinent to a plaintiff's lawsuit), but we have declined the invitation to assume causation away. *See Ross,* 430 Md. at 667–68, 63 A.3d 1. And although the Court of Appeals suggested in *Brooks* that a statutory violation may constitute a *prima facie* case of negligence, 378 Md. at 79, 835 A.2d 616, that holding does not relieve a plaintiff of the obligation to establish causation.[12] Contrary to the reading Raymond proposes, *Brooks* does not allow a plaintiff to defeat summary judgment simply because he has lived in a rowhouse in Baltimore and is found at some later point to have elevated blood lead levels.

Instead, as *Ross* reaffirmed, a plaintiff must connect the dots between a particular lead-laden environment and a particular child. By allowing a plaintiff to meet this burden with circumstantial evidence, we recognize that the causal path may not always reveal itself fully through documents, real-time tests or inspections of the property, or other forms of direct evidence. But just as a plaintiff cannot assume causation, he cannot surmount this hurdle through speculation—the overarching principle, which is neither new nor indigenous to lead paint cases, is that "[c]ircumstantial evidence may support a

---

**12.** *Brooks* eliminated notice of a lead-paint violation as *one element* of a negligence claim. 378 Md. at 72, 835 A.2d 616. The Court of Appeals explained that the plaintiffs did not have to provide notice and could submit their claim to the jury without proving that the landlord had notice "*if* the plaintiffs can establish a violation of the Housing Code *which proximately caused* [plaintiff's] injuries." *Id.* at 81, 835 A.2d 616 (emphasis added). This meant, in *Brooks,* that where a child had been seen chewing repeatedly on a windowsill in a home that upon later inspection specifically was found to contain lead-based paint, *id.* at 73–74, 835 A.2d 616 (and whom the record did not reflect lived or visited any property other than the one that was the subject of the litigation), she could submit her case to the jury without having to show that the defendant had notice of the condition. *Id.* at 72, 835 A.2d 616; *see also Polakoff v. Turner,* 385 Md. 467, 483, 869 A.2d 837 (2005) (permitting the plaintiff to submit her case to the jury if she "could establish a violation of the Code *which proximately caused* her injuries" (emphasis added)).

negligence determination if it 'amount[s] to a *reasonable like-lihood or probability* rather than a possibility[,]' " *Dow,* 144 Md.App. at 75, 796 A.2d 139 (quoting *Peterson,* 258 Md. at 17, 264 A.2d 851) (emphasis added), whether supported or connected through experts or not. *See also West v. Rochkind,* 212 Md.App. 164, 170–71, 66 A.3d 1145 (2013) ("There is no dispute that a negligence case may be proven using only circumstantial evidence, so long as it creates 'a reasonable likelihood or probability rather than a possibility' supporting a 'rational inference of causation' and is not 'wholly speculative.' ").

■ This brings us back to Raymond. *First,* in light of *Ross,* we need not linger over the correctness of the circuit court's decision to reject Raymond's experts' testimony about causation. *Ross* requires an expert to have (1) the requisite qualifications to give an expert opinion as to the source of lead exposure; and (2) an adequate factual basis to opine as to that source. *Ross,* 430 Md. at 662–63, 63 A.3d 1; *see also* Md. Rule 5–702.[13] The Court of Appeals's analysis of Dr. Blackwell–White's testimony in *Ross* applies equally here. We agree with the circuit court that Dr. Blackwell–White had neither the qualifications nor the factual basis to render an opinion as to the source of the lead Raymond ingested, and that she openly premised her conclusion, as she did in *Ross,* on assumptions rather than evidence. And as in *Ross,* Dr. Blackwell–White reached a conclusion as to the source notwithstanding the presence of other potential sources of lead, and as such her opinion "was as likely to confuse as to assist a jury." *Ross,* 430 Md. at 664, 63 A.3d 1.

---

**13.** Rule 5–702 governs the admissibility of expert testimony and provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Indeed, as the circuit court explained, the experts here didn't just assume the presence of lead-based paint because of the age of the house—they also expressed unsupported opinions as to the condition of one property versus another. And ironically, Dr. Blackwell–White confidently called the Appleton Street property a "smoking gun" while saying the same of the Harlem Avenue property.[14] Dr. Simon, in turn, testified that the Appleton Street property was in "worse condition" based purely on the records he reviewed. He had not looked closely at the impact of the Harlem Avenue property at all because he hadn't been asked to. That is, to Dr. Simon, the Appleton Street property is the only *known* source of lead because it is the only property he knows *about*, and insulating him from information about the Harlem Avenue property cannot allow him to rule it out as a cause as a matter of (uninformed) expert "opinion."

■ *Second*, with respect to the standard for causation, the circuit court asked the right question: "whether the plaintiff can prove circumstantially or inferentially that [the] chipping or peeling paint [from the Appleton Street property] contained lead and was the source of any lead ingested by him." And the circuit court presciently did not *require* the plaintiff to produce expert testimony connecting the causal dots—as discussed above, we now know definitively from *Ross* that "the link between a defendant's property and a plaintiff's childhood exposure to lead paint and dust may be established through circumstantial evidence, even if expert opinion testimony is not available." *Ross*, 430 Md. at 669, 63 A.3d 1.

■ We part analytical company with the circuit court, however, with regard to one nuance. When the court described the plaintiff's burden as requiring that "a plaintiff must prove that the deteriorated paint was in fact *the source* of the lead affecting the plaintiff," (emphasis added), it seemed

---

**14.** Dr. Blackwell–White actually flips the presumption: in her mind, a property is presumed to have lead paint *unless* it has been gut-rehabilitated or has been scraped and repainted. That theory is both inadmissible and legally incorrect.

to foreclose the possibility that a plaintiff could prove a reasonable likelihood or probability that the property was *a* source of lead affecting the plaintiff. The court cited the ultimate holding of *Dow*, in which we concluded that summary judgment should not have been granted because "[i]f believed, the evidence offered by [the plaintiffs] in opposition to the motion for summary judgment could establish that the chipping and peeling paint inside [the property at issue] was the *only* possible source of Dow's lead poisoning," *Dow*, 144 Md.App. at 76, 796 A.2d 139 (emphasis added), and correctly noted that that approach demonstrated a potential formula for plaintiffs to satisfy their evidentiary burden.

We did not mean to suggest in *Dow*, or elsewhere, that plaintiffs must rule out all other potential sources in all cases. That process of elimination revived the plaintiff's case in *Dow*, and on the other hand, the expert's inability to eliminate that uncertainty in *Taylor* contributed to our holding that summary judgment was appropriate there. *Taylor*, 207 Md.App. at 142, 51 A.3d 743. *Ross* went the extra step, too, in suggesting that even though a plaintiff need not produce an expert to establish causation, there are still "limits [to] the inferences in [a] plaintiff's favor" that yet could allow summary judgment. *Ross*, 430 Md. at 671, 63 A.3d 1. That suggestion does not mean, though, that as a matter of law, a plaintiff cannot create a genuine issue of fact that a property probably was responsible for something less than all of a plaintiff's demonstrated lead exposure. *See also West*, 212 Md.App. at 175, 66 A.3d 1145 (noting that a property "could readily share liability with two or three other places of exposure"). To be sure, that would be a hard case—among other things, such a plaintiff would need to produce probability-level evidence as to exposure at each property separately. But the fact that such a case might be hard to prove doesn't make it impossible, and the fact that a lead-exposed child might have lived or spent time in more than one lead-based-painted property should not foreclose that child as a matter of law from pursuing any one of those potential sources—as long as he is able to *rule in* the subject property in the first place

through an appropriate combination of direct or circumstantial evidence establishing the probability of exposure by that plaintiff in that property. We clarify, therefore, that a plaintiff's ability to prove causation through circumstantial evidence is limited by the probability requirement, whatever the factual theory, rather than any requirement to eliminate all other potential sources of exposure. From there, each case stands or falls on the quantum and quality of the evidence a plaintiff is able to produce.

■ The question here, then, is not whether the Appleton Street property is *the* probable source, but whether it is *a* probable source of the lead paint that allegedly caused Raymond's injuries. That is, did Raymond produce circumstantial evidence sufficient to create a genuine issue of material fact as to the *reasonable likelihood or probability* that he was exposed to lead at the Appleton Street property that caused his alleged lead-exposure injuries? We agree with the circuit court that he did not. The only evidence of lead at the Appleton Street property was the lone test on a transom over the rear exterior door of the house. The circuit court found that this "single positive test is insufficient as a matter of law to support an inference that lead was present in the paint of any *interior* surface" (emphasis added), and we agree. Construing all of the facts in his favor, we know that Raymond suffered from elevated blood-lead levels, but the summary judgment record also reveals exposure to lead at another "smoking gun" property no longer involved in this case. And we know that Raymond's blood-lead levels remained elevated through at least April 1997, long past the time frame alleged in the complaint and amended complaint—approximately 1993 to approximately 1995—while he was residing in and visiting other properties aside from the Appleton Street property.

Other details before the circuit court diminished further the likelihood of harm from the Appleton Street property. Raymond may, for example, have had a habit of mouthing, but the record here does not suggest it was any more likely that he mouthed or chewed on lead-based-painted surfaces at the

Appleton Street property than at the Harlem Avenue property. He also is not helped by the fact that the single positive exterior result came from a window frame, or transom, *above* the rear door, particularly when the answers to interrogatories stated that he "rarely played in the back yard," making it an unlikely if not impossible source of exposure.[15] *Compare Davis,* 117 Md.App. at 389, 700 A.2d 798 (denying summary judgment where evidence showed positive results from exterior testing specifically in areas where the plaintiff was known to have played). The factual allegations could, construed in Raymond's favor, arguably support a *possibility* that Raymond was exposed to lead there, but nothing more, and the circuit court did not err in granting summary judgment.[16]

Moreover, there was no evidence in the record of any Housing Code violations. So as much as Raymond makes of *Brooks,* he has not introduced any evidence on which he could base any presumption that might apply. The circuit court considered and rejected his argument in any event, explaining that the applicable Department of the Environment rule established precautions for abatement work and, correctly, that "[t]his regulatory premise for conducting safe abatement work is far different from an evidentiary presumption applicable in determining potential civil liability for personal injuries." The circuit court also correctly read *Brooks* still to require that a

---

15. Raymond argues that he need only establish one of the four "prongs" he proposes to establish proof of exposure to lead, an assertion that has no support in the case law and makes no sense. As he sees it, "proof is usually satisfied" through *any one* of: (1) a parent's testimony; (2) a pediatrician's testimony; (3) judicial notice of pica (a habit of mouthing inedible objects); or (4) testimony from health department personnel or a private inspector about lead testing. Although a mother or pediatrician might testify that a child mouths or has pica, this establishes at most the possibility that he ingested things he should not have, but not at all *what* he ingested.

16. We see nothing in *Ford,* 848 A.2d 1038, that compels a different result. In *Ford,* numerous positive lead test results inside and outside the home led authorities to recommend that the plaintiff relocate, there was only one property where she could have been exposed, and her blood lead levels spiked while she was living there. *Id.* at 1042–44; *see also Taylor,* 207 Md.App. at 146–47, 51 A.3d 743.

plaintiff show some "causal connection" between a violation and the injury. *See* note 13 above.

Because Raymond was left with no evidence—direct *or* circumstantial—that would establish the Appleton Street property as a probable source of his elevated blood-lead levels, and because his experts could not make evidence out of assumptions, we affirm the circuit court's order granting summary judgment to Dackman.

**ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**