Getty, J.
I respectfully dissent from the Majority’s conclusion that Terrence Rogers met his burden in this case to demonstrate *284 that his brief period of residency at the rental property owned by Home Equity USA, Inc. (“Home Equity”) at 3738 Towanda Avenue, Baltimore, Maryland (“the Towanda Property”) caused him harm. Based on the record before us, I would affirm the trial court’s grant of summary judgment in favor of Home Equity on the same grounds as the Court of Special Appeals, namely, that Mr. Rogers failed to show that the Towanda Property was a substantial factor in causing his elevated blood lead levels.
I write out of concern that today’s Majority and Concurring opinions substantially lower the bar that a plaintiff must surpass in order to avoid summary judgment in a lead paint negligence action. Under well-established principles of Maryland tort law, the proper burden of proof as to causation, even at the summary judgment stage, is whether the plaintiff has shown that the defendant’s property was a probable, meaning more likely than not, source of his lead poisoning. Therefore, when there are two or more reasonably likely causes of the plaintiffs lead poisoning, as occurred in this case, the plaintiff must show that the defendant’s property is a more probable source of the harm than the other(s) in order to survive summary judgment. See Peterson v. Underwood, 258 Md. 9, 17, 264 A.2d 851 (1970).
By contrast, the Majority and Concurrence both rely instead upon our holding in Hamilton v. Kirson, 439 Md. 501, 96 A.3d 714 (2014), which they regard as establishing a new, alternative theory of causation, distinct from that set forth in a line of cases starting with Dow v. L & R Props., Inc., 144 Md.App. 67, 796 A.2d 139 (2002). See Majority Op. at 266-67, 160 A.3d at 1216; Concurring Op. at 282-83, 160 A.3d at 1226. Under a Dow theory of causation, a plaintiff may defeat a defense motion for summary judgment in a lead paint case if he can “rule out” other sources of lead exposure, and thereby show that the subject property is the “only possible” source of his lead exposure. 144 Md.App. at 75-76, 796 A.2d 139. But, under what the Concurrence describes as a new “Kirson theory of causation,” the Majority today holds that even without excluding other reasonably probable sources of lead, a *285 plaintiff may establish a prima fade negligence case if he can “rule in” the subject property as a source of lead exposure by showing, through direct or circumstantial evidence, that it is “reasonably probable” that the plaintiff was exposed to lead-based paint at the subject property, and that there is a “reasonable probability” that the exposure at that property contributed to his elevated blood lead levels. See Majority Op. at 266-67, 273-74, 160 A.3d at 1216, 1220-21; Concurring Op. at 277-79, 160 A.3d at 1223-24.
However, that alternative theory of causation was not our holding in Kirson, in which we held that plaintiffs had not met their burden under a Dow theory of causation. 439 Md. at 544-46, 96 A.3d 714. Rather, the alternative theory upon which the Majority relies is based upon a hypothetical described in Kirson that had no connection to the facts of that case and, therefore, was dicta. Id. at 537-38, 96 A.3d 714. Indeed, as noted in the Concurrence, this is, apparently, the first time such a theory has been applied. See Concurring Op. at 260-61, 160 A.3d at 1212-13.
I respectfully disagree with the Majority and Concurrence’s endorsement today of a new, alternative theory of causation in lead paint cases. Initially, I believe that the hypothetical described in Kirson does not support the Majority’s holding. The hypothetical describes a scenario in which a unit of four, side-by-side row houses “were built at the same time in the 1920[ ]s,” those houses were “owned as a group by a series of persons or entities through the 1950[ ]s,” and the home that is the subject property in the litigation was situated between two others in the group that had tested positive for lead-based paint. Kirson, 439 Md. at 538, 96 A.3d 714. According to the Kirson Court, “in the absence of evidence of lead abatement measures,” that hypothetical shows sufficient “circumstantial evidence from which a jury could infer reasonably that the subject property contained lead-based paint.” Id. That statement may be true, but even if it is, it is limited to the specific set of facts set forth in the hypothetical—a unit of homes built together in the 1920s, sustained common ownership of those homes for decades, and the absence of any evidence of lead abatement measures. Those facts are entirely divergent from the relevant facts of this case, which involve potential lead *286 exposure in two widely separated homes, not in common ownership, and where there was evidence that lead abatement measures had occurred in the source property.
Moreover, as the Kirson Court itself recognized, the hypothetical does not describe what kind of circumstantial evidence would be sufficient for a separate prong of the substantial factor analysis for source causation in a lead paint case, namely, whether a plaintiffs period of residency at a given property that may have contained lead-based paint caused his elevated blood lead levels. That prong of the analysis is particularly significant when, as here, the plaintiff has also resided in at least one other home containing lead-based paint. The hypothetical thus has nothing to offer as to what I view as the critical issue in this case—whether Mr. Rogers has shown sufficient evidence that it was his stay at the Towanda Property that caused his elevated lead blood levels, as opposed to his immediately prior stay at another property that the plaintiffs expert conceded contained lead-based paint, 6419 Chinquapin Parkway (the “Chinquapin Property”).
As to that issue, I disagree with the Majority’s holding that, at the summary judgment stage, Mr. Rogers could “rule in” the Towanda Property as a substantial factor cause of his elevated blood lead levels merely by advancing circumstantial evidence that the Towanda Property was a “reasonably probable source” of those elevated blood lead levels, and without showing that it was a more probable source than the Chinqua-pin Property. See Majority Op. at 273-75, 160 A.3d at 1220-21. The Majority, relying upon our recent holding in Rowhouses, Inc. v. Smith, 446 Md. 611, 655, 133 A.3d 1054 (2016), defines a “reasonably probable source” as floating somewhere between a “possibility” that the defendant’s property was the source of the plaintiffs lead exposure and elevated blood lead levels and a showing that the property was the “more probable than not” source of that harm. Majority Op. at 274, 160 A.3d at 1220-21. I believe that the Majority’s holding reflects a troubling trend in this Court’s recent lead paint cases, in which the Court has moved away from the longstanding standard in Maryland tort law that a plaintiff must put forth sufficient evidence to enable *287 a jury to find that it was more probable than not that the defendant caused his harm. As this Court explained in Peterson v. Underwood, the more probable than not standard is necessary at the summary judgment stage in order to prevent the jury from assigning fault based on “mere conjecture or speculation” that the defendant caused the harm at issue. 258 Md. at 19, 264 A.2d 851. This Court has not provided a clear basis in law or public policy for its recent shift away from the more probable than not standard for causation in lead paint cases at the summary judgment stage, and the nebulously defined “reasonably probable source” standard that has taken its place is likely to prove difficult for trial courts to apply.
Moreover, Rowhouses, on which the Majority relies, was premised on a Dow theory of causation, in which a plaintiff still has to rule out other sources of the plaintiffs lead exposure in order to show that a defendant’s property was the source of his lead poisoning. The Majority’s holding that it is enough for a plaintiff to “rule in” a property as a “reasonably probable source” of the plaintiffs lead exposure and elevated blood lead levels even when, as is true in this case, there are other reasonably probable sources of that harm, thus operates to substantially lower the bar for causation in a lead paint action below even the lessened standard set in Rowhouses.
Rather than endorse a new causal theory that significantly furthers the recent trend towards a lower burden of proof for causation in lead paint cases, I would instead rely on the well-established principle of tort law that, when a plaintiffs own evidence shows that there are two or more potential causes of an injury, each of which is more than a mere possibility, the plaintiff must show that the source for which the defendant is responsible is a more probable source of the harm than the other(s) in order to survive summary judgment. See Peterson, 258 Md. at 17, 264 A.2d 851.[1] Applying that standard to the *288 facts of this case, I agree with the Majority and Concurrence that the evidence put forth by Mr. Rogers was sufficient for a reasonable jury to infer that it was more probable than not that there was lead-based paint in the interior of the Towanda Property during the time that Mr. Rogers resided at that property. However, I would follow the Court of Special Appeals in holding that the evidence put forth by Mr. Rogers was insufficient to show that his time residing at the Towanda Property was a more probable source of his harm from lead exposure than his time residing at another property that also contained lead-based paint and, therefore, summary judgment was appropriately granted in favor of Home Equity.

A. Causation in Lead Paint Litigation

“ ‘It is fundamental that in a negligence action the plaintiff has the burden of proving all the facts essential to constitute the cause of action,’ ” including that “the defendant’s negligence was a proximate cause of the accident or injury.”[2] *289 Kirson, 439 Md. at 526, 96 A.3d 714 (quoting Peterson, 258 Md. at 15, 264 A.2d 851). One aspect of proximate cause, and the only aspect at issue in this case, is causation-in fact or, in other words, “whether [a] defendant’s conduct actually produced an injury.” Id. (quoting Peterson, 258 Md. at 17, 264 A.2d 851). There are “two tests [that] have developed to determine if causation-in-fact exists, the but for test and the substantial factor test.” Pittway Corp. v. Collins, 409 Md. 218, 244, 973 A.2d 771 (2009) (citing Peterson, 258 Md. at 16, 264 A.2d 851). The “but for” test is applicable if there is only one possible cause, and the question is whether “the injury would not have occurred ‘but for’ the defendant’s negligent act.” Id. (citing Peterson, 258 Md. at 16, 264 A.2d 851). The “substantial factor” test is applicable if “two or more independent negligent acts bring about an injury.” Id. Black’s Law Dictionary defines the “substantial-factor test” as “the principle that causation exists when the defendant’s conduct is an important or significant contributor to the plaintiffs injuries.” (10th ed. 2014).
As described by the Majority, the Court of Special Appeals first applied the substantial factor test in a lead paint case in Bartholomee v. Casey, 103 Md.App. 34, 651 A.2d 908 (1994), and we adopted the substantial factor test in a lead paint case in Ross v. Housing Authority of Baltimore City, 430 Md. 648, 63 A.3d 1 (2013). Majority Op. at 273-74, 160 A.3d at 1220. In Ross, we explained that substantial factor causation in a lead paint case “can be conceived as a series of links”:
(1) the link between the defendant’s property and the plaintiffs exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels, and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff. To be a substantial factor in causing [a plaintiffs] alleged injuries, the [subject proper *290 ty] must have been a source of [the plaintiffs] exposure to lead, that exposure must have contributed to the elevated blood lead levels, and the associated increase in blood lead levels must have been substantial enough to contribute to her injuries.
Ross, 430 Md. at 668, 63 A.3d 1. The Majority refers to the three links described in Ross as “(1) source, (2) source causation, and (3) medical causation.” Majority Op. at 265, 160 A.3d at 1215. Later, in Kirson, we clarified that in order to establish the first “source” link in the chain, “the plaintiff must tender facts admissible in evidence that, if believed, establish two separate inferences: (1) that the property contained lead-based paint, and (2) that the lead-based paint at the subject property was a substantial contributor to the victim’s exposure to lead.” 439 Md. at 529-30, 96 A.3d 714.
B. The Kirson Hypothetical Does Not Support the Majority’s Holdiny
The Majority relies in part upon our statement in Kirson, that “[a] lead-[based] paint poisoned plaintiff may prove circumstantially that the subject property contained lead-based paint in a number of ways.” Id. at 537, 96 A.3d 714. As described above, that statement was unrelated to the Court’s holding in Kirson, and is thus dicta. The only support the Court offered for its dicta statement in Kirson was a hypothetical based upon an illustration. The illustration was “of four row houses, A, B, C, and D, in which row house B, the subject property, is between row house A and row house C,” and “[t]he interiors of row house A and row house C both had previously tested positive for the presence of lead-based paint.” Concurring Op. at 279, 160 A.3d at 1224 (describing the illustration in Kirson, 439 Md. at 537, 96 A.3d 714). The Kirson Court then offered the following hypothetical based upon that illustration:
In this hypothetical, row house “B” is the subject property [] that a plaintiff hopes to prove, through circumstantial evidence, contains lead-based paint. Perhaps the row house was razed, however, and direct testing is impossible at the time of the litigation. There exists, however, evidence that *291 these four row houses were built at the same time in the 1920[ ]s and that they were owned as a group by a series of persons or entities through the 1950[]s. Moreover, the City’s records reveal that row houses “A” and “C” [ ] tested positive previously for lead paint on the interior of the houses.
Kirson, 439 Md. at 538, 96 A.3d 714.
The Kirson Court stated that “in this hypothetical (at least in the absence of evidence of lead abatement measures), the plaintiff is able to present circumstantial evidence from which a jury could infer reasonably that the subject property contained lead-based paint—without having to exclude all other sources of potential exposure to lead-paint poisoning [as required in a Dow theory of causation].” Id. As previously discussed however, even accepting that statement as correct, it is limited to the narrow set of facts described in the hypothetical. The hypothetical describes a unit of side-by-side row houses built in the 1920s, when lead-based paint was commonly used to paint the interior of homes. And, especially critical to the hypothetical, the houses were held in common ownership as a group for decades, supporting logical inferences that they were painted in the same manner and that maintenance practices in one or two of the homes were replicated in all of them. Two of the houses in common ownership, which bordered the subject property on both sides, had tested positive for lead-based paint prior to the period of residency of the plaintiff in the subject property. Finally, there was an absence of any evidence of lead abatement measures.
None of those facts are mirrored in this case. Here, during the period of time at issue, Mr. Rogers lived in two geographically distant properties. These properties were not in common ownership, so there is no assumption that a landlord or management company used similar practices for painting or maintaining the properties. Although there was additional circumstantial evidence that lead-based paint was present in the interior of the Towanda Property, in the form of a 1976 test positive for interior lead-based paint and other reports *292 and witness testimony, that evidence was entirely dissimilar to that advanced in the hypothetical in Kirson. And, while there is no evidence in the record of a full, gut rehabilitation of the Towanda Property, there was evidence of some lead abatement measures in the interior of the Towanda Property prior to Mr. Rogers’ period of residency at that property, including abatement records from 1976, and building permits for additional renovations between 1976 and 1996.
Thus, contrary to the reasoning advanced in the Concurrence, Kirson and the hypothetical stated therein do not support the Majority’s holding that there was still lead-based paint in the Towanda Property at the time Mr. Rogers resided there. See Concurring Op. at 281-83, 160 A.3d at 1225-26.[3] Nonetheless, I agree with the Majority that the evidence that the interior of the Towanda Property tested positive for lead-based paint, and that there was no evidence of a full gut rehabilitation or other full abatement of the interior, is sufficient for a jury to infer that it was more probable than not that there was lead-based paint in the interior of the property. See Taylor v. Fishkind, 207 Md.App. 121, 144, 51 A.3d 743 (2012) (explaining that “[i]f the [subject] property contained lead-based paint when it was originally constructed, then lack of evidence of a gut rehabilitation prior to [the plaintiff] living there would support the conclusion that the property still *293 contained lead-based paint when [the plaintiff] lived there”); Majority Op. at 272, 160 A.3d at 1219.
Where I part company with the Majority is their conclusion that the evidence put forth by Mr. Rogers was sufficient to show a probability that any exposure to lead-based paint at the Towanda Property was a substantial factor cause of his elevated blood lead levels, and thus sufficient to meet the second “source causation” link in the Ross chain.[4] See Majority Op. at 277, 160 A.3d at 1223. The Kirson hypothetical was offered only to illustrate that a plaintiff “may prove circumstantially that the subject property contained lead-based paint.” 439 Md. at 537, 96 A.3d 714 (emphasis added). The hypothetical thus offers no support to the Majority’s conclusion that Mr. Rogers put forth sufficient evidence for a reasonable jury to infer that the Towanda Property was a substantial factor cause of his elevated blood lead levels.

C. The Majority Opinion Lowers the Bar for Plaintiffs’ Burden of Proof as to Causation at the Summary Judgment Stage in Lead Paint Litigation Without Providing a Policy or Legal Foundation For That Shift

In addition to relying upon Kirson, the Majority also rests its holding that Mr. Rogers has put forth sufficient evidence for a reasonable jury to infer that the Towanda Property was *294 a substantial factor cause of his elevated blood lead levels on the standard of proof for a causation showing at the summary judgment stage in a lead paint case. The Majority, citing to our recent opinion in Rowhouses, Inc. v. Smith, 446 Md. 611, 656, 133 A.3d 1054 (2016), holds that the standard of proof for causation in lead paint cases at the summary judgment stage is a “reasonable probability,” which is less than “more likely than not” but more than a “mere possibility.” Majority Op. at 274, 160 A.3d at 1220-21. Because of what it construes as the relatively lower standard of proof for causation in a lead paint case, at least at the summary judgment stage, the Majority holds that even when there are two probable sources of lead-based paint that may have caused a plaintiffs harm from elevated blood lead levels, “a plaintiff is not required to show that one source of his lead exposure contributed to his injury to a greater degree than another.” Majority Op. at 274, 160 A.3d at 1221. As I shall explain, I believe that our prior holding in Rowhouses, Inc., combined with the Majority’s holding today, has substantially weakened the showing that a plaintiff must make as to causation in order to avoid summary judgment in a lead paint case, without articulating a clear reason grounded in the law or public policy for that shift.
In Peterson v. Underwood, which predates our lead paint jurisprudence, we set a standard, well-grounded in tort law theory, for a plaintiffs showing as to causation at the summary judgment stage, even when there are multiple potential substantial factor causes of an injury:
[T]he plaintiff produces legally sufficient proof to get to the jury once he shows it is more probable than not that defendant’s act caused his injury. This does not mean plaintiff is required to exclude every other possible cause of the accident. But where plaintiff by his own evidence shows two or more equally likely causes of the injury, for only one of which defendant is responsible, plaintiff can not recover.
Peterson, 258 Md. at 17, 264 A.2d 851 (emphasis added) (citations omitted). Similarly, in Bartholomee v. Casey, the first case in which the Court of Special Appeals applied a substantial factor analysis in a lead paint case, the intermedi *295 ate appellate court held that there was insufficient evidence from which a jury “rationally could conclude that [the plaintiffs] exposure to lead from the paint at the [the subject property] was a substantial factor in causing the lead poisoning,” when there was no testimony that “[plaintiffs] exposure to lead from the paint at the [subject property] was in any way more significant than her exposure to lead dust from the demolition and construction next door at [another property].” 103 Md.App. 34, 58, 651 A.2d 908 (1994).
Subsequently, in Dow v. L & R Properties, Inc., the Court of Special Appeals considered a case where the plaintiff had put forth circumstantial evidence in support of a lead paint claim. 144 Md.App. 67, 73-74, 796 A.2d 139 (2002). The intermediate appellate court, drawing upon language from Peterson, reiterated that such circumstantial evidence “may support a negligence determination if it ‘amount[s] to a reasonable likelihood or probability rather than a possibility.’ ” Id. at 75, 796 A.2d 139 (quoting Peterson, 258 Md. at 17, 264 A.2d 851). The court held that evidence that “the [source property] was built prior to 1950, that such dwellings often contain lead-based paint, that [the plaintiff] ate paint chips in the dwelling, that [the plaintiff] was diagnosed with lead poisoning,” and that, prior to that diagnosis, “[the plaintiff] did not spend time anywhere else and was never exposed to any other sources of lead,” was sufficient to establish that the property “was the only possible source of [the plaintiffs] lead poisoning.” Id. at 75-76, 796 A.2d 139. Coupled “with the undisputed fact that homes built before 1950 often contain lead-based paint,” the court determined that the evidence “could indeed support an inference that the paint [in the interior of the home] in question contained lead” and, therefore, summary judgment should have been denied. Id. at 76, 796 A.2d 139.
A Dow theory of causation, which involves the use of circumstantial evidence to “rule out” other probable sources of lead-based paint exposure “in order to prove that it is probable that the subject property contained lead-based paint,” Kirson, 439 Md. at 536, 96 A.3d 714, is entirely consistent with our precedent in Peterson and other cases that a plaintiff must *296 show that a defendant’s property was more probably than not the cause of his injury in order to survive summary judgment. Although the Dow court stated that the standard that a plaintiff must meet as to causation at the summary judgment stage is a “reasonable likelihood or probability,” and did not employ the phrase “more probable than not,” both wordings of the standard derive from the very same case, Peterson, and thus presumably should be read together as a unitary standard. In Ross, the first case in which we adopted the Dow theory of causation, and Kirson, 439 Md. at 530-31, 96 A.3d 714, we likewise quoted the “reasonable likelihood or probability” language derived from Peterson without analyzing that language in detail. See Ross, 430 Md. at 669, 63 A.3d 1.
However, in this Court’s most recent lead paint case, Rowhouses, Inc., this Court “determined] that for purposes of causation in lead-based paint cases at the summary judgment phase, a reasonable probability requires a showing that is less than ‘more likely than not,’ but more than a mere ‘possibility.’ ” 446 Md. at 655, 133 A.3d 1054. We explained that “there are degrees of probability, with more likely than not having the highest degree of probability, followed by reasonable probability, followed by mere possibility.” Id. The Court proceeded to define a “reasonable probability” as “a fair likelihood that something is true,” and stated that “[i]n the context of lead-based paint cases, that means that the subject property is a reasonable probable source of a plaintiffs lead exposure where there is a fair likelihood that the subject property contained lead-based paint and was a source of the lead exposure.” Id. at 657, 133 A.3d 1054. The Court also distinguished a “possibility” from a “reasonable probability” or “fair likelihood,” explaining that “a possibility is a mere chance that something might be true, as opposed to a fair likelihood that something is true.” Id. at 658, 133 A.3d 1054. The Court noted that “[i]n the context of lead-based paint cases, any property in which a plaintiff has resided or visited could be a possible source of the plaintiffs lead exposure,” but that such a property “does not become a reasonable probable source without additional evidence that elevates the mere chance that the *297 property contained lead-based paint and was a source of lead exposure to the fair likelihood that the property contained lead-based paint and was a source of lead exposure.” Id. at 659, 188 A.3d 1054.
The Court then went on to state that “circumstantial evidence may be used both to establish the subject property as a reasonable probable source and to rule out other reasonably probable sources.” Id. at 659, 133 A.3d 1054. However, the actual holding in Rowhouses was limited to the facts of the case, in which the plaintiff had sought to use circumstantial evidence to “rule out” other probable sources of lead exposure under a Dow theory of causation. As previously discussed, the Majority opinion today appears to be the first time this Court has held that a plaintiff may “rule in” a property as a source of lead exposure and a substantial factor cause of the plaintiffs lead poisoning solely through the use of circumstantial evidence.
I believe that this Court’s departure from Peterson’s “more probable than not” standard of proof for causation in lead paint cases at the summary judgment stage, both by the Rowhouses, Inc. Court, as well as by the Majority today, is unwarranted. First, it may give rise to an artificial distinction between lead paint cases and the rest of our tort law jurisprudence, without a clearly articulated basis in law or public policy to support such a distinction. Second, in defining the “reasonable probability” standard as anything between a “possibility” and “more likely than not,” the Court leaves open the possibility that circumstantial evidence as to causation in a lead paint case that has just one sliver of weight more than outright speculation or inferences not supported by logic might be deemed sufficient to advance beyond summary judgment. Third, it is likely that trial courts will have great difficulty in fairly applying the standard given the absence of any guidance as to what kind of additional evidence is needed to transform a mere possibility that a property was a source of a plaintiffs lead exposure and elevated blood lead levels into a “reasonable probability” that the property was the source of the harm.
*298 Moreover, I am even more concerned by the Majority’s extension of the “reasonably probable” standard to permit a plaintiff to move past summary judgment merely by “ruling in” a property as a reasonably probable source of the plaintiffs lead poisoning, even when there is one or more other reasonably probable sources of that harm. That holding is likely to unfairly burden property owners in factual situations similar to this case: where a plaintiff, who clearly has elevated blood lead levels, has lived in several homes, and the evidence is less than clear, either as to which of those homes had interior lead-based paint while the defendant lived there, or as to which source of lead-based paint was the likely cause of plaintiffs elevated blood lead levels. See Peterson, 258 Md. at 19, 264 A.2d 851 (noting that permitting a case to advance to a jury on “limited proof’ would allow the jury “to indulge in mere conjecture or speculation” and thus “amount to holding that liability may be predicated upon the mere happening of an accident which, exclusive of res ipsa loquitur situations, is not the law of Maryland”); Dackman, 218 Md.App. at 612-13, 75 A.3d 327 (recognizing “the real-life evidentiary challenges that proving lead paint injuries poses” but noting that courts “have declined the invitation to assume causation away” in lead paint cases).

D. Mr. Rogers Has Not Presented Evidence From Which a Jury Could Logically Infer That His Elevated Lead Blood Levels Were More Probably Than Not Caused By His Period of Residence at the Towanda Property, as Opposed to the Chinquapin Property

Applying what I believe to be the correct legal standard, I would hold that the evidence identified by the Majority as to “source causation,” the link between Mr. Rogers’ period of residence at the Towanda Property and his elevated blood lead levels, is not sufficient to show that the Towanda Property was a more probable source of those elevated levels than the Chinquapin Property. The Majority identified the following evidence as to source causation:
*299 (1) his blood tests demonstrating an elevated lead level of 21 ¡xg/dL in January 1997 and 20-21 ¡xg/dL in March 1997; (2) his April 30, 1997 test, which read 17-18 [xg/dL, and his August 22, 1997 test, which shows a further decline to 13 |xg/dL; (3) Dr. McDaniel’s testimony that it takes 30 to 45 days after the exposure has ended for the level of lead in a child’s blood to decrease; (4) a 1997 Health Department caseworker’s report that she observed Rogers mouthing a windowsill during a home visit; (5) the 2014 Arc exterior testing that found lead-based paint on the porch, where Rogers-Coy testified that she sat with Rogers; (6) Dr. Simon’s conclusion that “to a reasonable degree of scientific probability ... Towanda ... was a substantial contributing source of [] Rogers’ lead exposure and lead poisoning during his early childhood”; and (7) Dr. McDaniel’s report, which stated “with a high degree [of] medical probability” that Towanda “was a substantial contributing factor to his elevated lead levels.”
Majority Op. at 274-75, 160 A.3d at 1221 (alterations and ellipses in original).
Home Equity has argued that “because of the gap in blood lead testing between March 25, 1996 and January 8,1997, it is impossible to know whether [Mr.] Rogers’ blood lead levels increased when he moved to [the] Towanda [Property].” Majority Op. at 275, 160 A.3d at 1221. The Court of Special Appeals agreed with that argument, holding that “Mr. Rogers did not produce evidence that created a reasonable probability that he was exposed to lead at the Towanda Property that caused his alleged lead-exposure injuries,” and that his evidence only “supported a possibility that he was exposed to lead there.” Rogers v. Home Equity USA, Inc., 228 Md.App. 620, 645, 142 A.3d 616 (2016) (emphasis in original).
The Majority acknowledges that Mr. Rogers “cannot prove that his blood lead levels increased when he moved to [the] Towanda [Property].” Majority Op. at 276, 160 A.3d at 1222. Instead, the majority relies primarily upon Dr. McDaniel’s testimony, which the Majority characterizes as standing for the proposition that “once [Mr.] Rogers was no longer exposed *300 45 days.” Id. From that testimony, the Majority determines that “a jury could reasonably infer that if [the] Towanda [Property] was not a contributing source” of Mr. Rogers’ elevated blood lead levels, “his March 1997 lead level would have been lower,” and that “his blood lead level declined in April 1997 because he had left the source of his exposure, which was [the] Towanda [Property].” Id. The Majority holds those inferences are sufficient to “demonstrate that [the] Towanda Property was a reasonably probable cause of [Mr. Rogers’] elevated blood lead levels, and that summary judgment was improperly granted on this ground.” Id. at 277, 160 A.3d at 1223.
I do not believe that Dr. McDaniel’s testimony was sufficient to show that the Towanda Property was a more probable source of Mr. Rogers’ harm than the Chinquapin Property, where Mr. Rogers resided immediately prior to his stay at the Towanda Property and where he first displayed elevated blood lead levels. Dr. McDaniel’s testimony, at most, supports the proposition that Mr. Rogers’ blood lead levels would decrease within 30 to 45 days after he was no longer exposed to lead. However, because of the gap in blood lead testing between March 25, 1996 and January 8, 1997—a period during which Mr. Rogers resided at the Chinquapin Property, which Dr. McDaniel agreed was a source of his lead exposure—it may be that Mr. Rogers’ blood lead levels were higher during that period than during any of his recorded tests. Therefore, his 21 |xg/dL blood lead level result in January 8,1997 could, in fact, have reflected a decrease from a higher blood lead level 30 to 45 days earlier, when he resided at the Chinquapin Property. Indeed, Dr. McDaniel explicitly conceded in her deposition testimony that the January 8, 1997 result could reflect a decrease from a higher result from before Mr. Rogers moved into the Towanda Property.
Critically, Dr. McDaniel did not testify that, after an initial decrease when Mr. Rogers was removed from the source property of his lead exposure, his blood lead levels would *301 continue to further decrease every additional 30 to 45 days.[5] Rather, that is an inference that the Majority believes a jury could reasonably draw from Dr. McDaniel’s testimony. And, the Majority believes that a jury could apply that inference to the facts to conclude that, because Mr. Rogers’ blood lead level did not show a significant decrease from January 1997 to March 1997, while he resided at the Towanda Property, and declined from March 1997 to April 1997, after he left that property, the Towanda Property was the cause of his injury. But, an equally plausible inference from Dr. McDaniel’s testimony and the other evidence in the record is that Mr. Rogers’ blood lead levels in January 1997 reflect a decrease from a higher level 30 to 45 days earlier, when he resided at the Chinquapin Property, and that his decrease in lead levels seen in the subsequent test results in March, April, and August of 1997 reflects a gradual decrease in lead leaving his system after he moved from that property.
I agree with the Majority that a jury could logically and reasonably infer from Dr. McDaniel’s testimony and the other evidence in the record that the Towanda Property was a “reasonable probable cause” of his harm, as the Majority defines that term, along with the Chinquapin Property. But, the evidence in the record and reasonable inferences deducible therefrom are not sufficient to show that the Towanda Proper *302 ty was a more probable source of Mr. Rogers’ elevated blood lead levels than the Chinquapin Property and, thus, that the Towanda Property was a substantial factor cause of his harm. As I would follow the Court of Special Appeals in affirming the trial court’s grant of summary judgment on those grounds, I respectfully dissent.

. This standard may not apply when the plaintiff merely claims that the defendant’s properly is a contributing source of his harm from lead exposure, as part of a claim that multiple sources of lead exposure cumulatively proximately caused his harm. See, e.g., Hamilton v. Dack *288 man, 213 Md.App. 589, 616, 75 A.3d 327 (2013) (noting that a plaintiff may be able to “create a genuine issue of fact that a property probably was responsible for something less than all of [his] demonstrated lead exposure,” as part of a negligence claim that multiple contributing sources of lead concurred to proximately cause his elevated blood lead levels, although also noting that such a claim would be a "hard case” to establish, because “a plaintiff would need to produce probability-level evidence as to exposure at each property separately”). Here, Mr. Rogers’ complaint brought claims against the owners of both the Towanda Property and the Chinquapin Property, but he then voluntarily dismissed his claims against the owners of tire Chinquapin Property prior to the trial court's summary judgment ruling. Therefore, he was required to show that the Towanda Property was a more probable source of harm than the Chinquapin Property.

. As the Majority notes, “[Mr,] Rogers seems to have based his negligence claim” upon a violation of the Baltimore City Housing Code. Majority Op. at 264, 160 A.3d at 1214. Relying on Brooks v. Lewin Realty III, Inc,, the Majority states that "[u]nder Maryland's common-law Statute or Ordinance Rule, [Mr.] Rogers can make out a prima facie case of negligence based upon a violation of the Housing Code by demonstrating (1) the violation of a section of the Housing Code ‘designed to protect a specific class of persons which includes the plaintiff,’ and (2) ‘that the violation proximately caused the injury complained of.’ ” Majority Op. at 264, 160 A.3d at 1215 (quoting *289 Brooks, 378 Md. 70, 79, 835 A.2d 616 (2003)). However, as the Court of Special Appeals has recognized, Brooks' holding “does not relieve a plaintiff of the obligation to establish causation.” Hamilton v. Dackman, 213 Md.App. at 613, 75 A.3d 327 (footnote omitted).

. More broadly, given the Kirson hypothetical's reliance on a very particular set of facts, it should not be read to stand for the proposition that, whenever an individual home was built in the 1920s, or another period of time in which lead-based paint was commonly used, and there is some additional circumstantial evidence of the presence of lead-based paint in the interior of the home, that is sufficient to for a plaintiff to survive summary judgment as to whether the subject property contained lead-based paint. As the Kirson Court recognized, "Maryland courts 'have for some time required more of a plaintiff than simply a showing that he lived in an old house in an area where lead-based paint historically was present.’ ” Id. at 541, 96 A.3d 714 (quoting Hamilton v. Dackman, 213 Md.App. 589, 612, 75 A.3d 327 (2013). Thus, in addition to the age of the home, the plaintiff must present additional evidence to show that the interior of the home contained lead-based paint. That could be in the form of direct evidence of a positive lead-paint test while the plaintiff resided on the property, or robust circumstantial evidence, such as that described in the Kirson hypothetical.

. As noted previously, we held in Kirson that in order to establish the first “source” link in the chain of causation in a lead paint case, the plaintiff must not only show sufficient evidence that the property contained lead-based paint, but also "that the lead-based paint at the subject property was a substantial contributor to the victim’s exposure to lead.” 439 Md. at 530, 96 A.3d 714. However, the evidence on which Mr. Rogers primarily relies to establish that lead-based paint at the Towanda Property was a substantial contributor of his exposure to lead are tests showing elevated blood lead levels while he resided at the Towanda Property, and expert opinion interpreting those results. Thus, in this case, the issue of whether lead-based paint on the Towanda Property was a substantial factor cause of Mr. Rogers’ exposure to lead turns entirely on whether he has presented sufficient evidence that his elevated blood lead levels in those tests reflect exposure to lead at the Towanda Property, rather than the Chinquapin Property—the second link in the Ross chain.

. Dr. McDaniel gave an opinion that Mr. Rogers’ drop in blood lead levels from 20-21 p,g/dL on March 26, 1997 to 17-18 (j-^dL on April 30, 1997 was consistent with her statement that a decrease in blood lead levels would take 30 to 45 days from his removal from a source of lead exposure. However, she clarified later in her deposition that, despite conceding that it was "possible” that Mr. Rogers had a higher blood lead level prior to residing at the Towanda Property, she assumed that Mr. Rogers’ blood lead levels increased when he moved from the Chinquapin Property to the Towanda Property. That assumption is also reflected in Dr. McDaniel’s written report, dated October 24, 2014, prepared for this case, in which she stated that "[Mr.] Rogers’ [blood] lead levels rose substantially while living [at the Towanda Property].” Therefore, her opinion, that the decrease in blood lead levels from March 26, 1997 to April 30, 1997 was consistent with her statement that a blood lead level reduction takes 30 to 45 days from removal from the source of exposure, was premised on an assumption that it was the first decrease in Mr. Rogers' blood lead levels to occur.